# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAMUEL I. HYLAND,<br>　　　individually and on behalf of all<br>　　　　　others similarly situated,<br><br>　　　*Plaintiff*,<br>　　　　　　v.<br><br>J.P. MORGAN SECURITIES, INC.,<br>　　　a Delaware corporation,<br><br>　　　*Defendant*. | Civil Action No. _____<br><br><br>**CLASS ACTION**<br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF
FEDERAL SECURITIES LAWS;
CIVIL CONSPIRACY; AND
AIDING AND ABETTING
<u>BREACH OF FIDUCIARY DUTY</u>**

## TABLE OF CONTENTS

NATURE OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

OVERVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

THE PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

RELEVANT NON-PARTY ENTITIES AND PERSONS. . . . . . . . . . . . . . . . . . . . . . . . . 5

CLASS ACTION ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUBSTANTIVE ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

SCIENTER ALLEGATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

LOSS CAUSATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

PLAINTIFF'S INVESTIGATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

NO SAFE HARBOR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .68

**COUNT I**
SECTION 10(b) AND RULE 10b-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**COUNT II**
AIDING AND ABETTING
BREACH OF FIDUCIARY DUTY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

**COUNT III**
CIVIL CONSPIRACY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

JURY TRIAL DEMAND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Plaintiff Samuel I. Hyland ("Plaintiff"), individually and on behalf of all others similarly situated, through counsel, alleges the following upon personal knowledge as to himself and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by counsel, as detailed in paragraphs 197 through 199 below:

## NATURE OF ACTION

1.      This seller class action is brought against defendant J.P. Morgan Securities, Inc. ("JPMSI" or the "Defendant") in connection with the Defendant's participation in an unlawful entrenchment scheme, including its creation of materially false, incomplete and misleading statements regarding the merger (the "Merger") of Bank One Corporation ("Bank One") into the Defendant's parent corporation, JPMorgan Chase & Co. ("JPMC" or the "Company").

2.      The class seeks to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") and for violations of common law.

## OVERVIEW

3.      By late 2003, JPMC's performance, stock price, and reputation had deteriorated for years under the stewardship of William B. Harrison, Jr. ("Harrison"), the Company's Chairman and then-Chief Executive Officer ("CEO").

4.      Following years of mismanagement characterized by disastrous transactions, increasingly-vocal shareholder discontent and widespread public reports of Harrison's imminent ouster, Harrison recognized that his lucrative and powerful position was in jeopardy as 2004 approached.

5.      By contrast, Bank One's CEO and Chairman, the widely-lauded Jamie Dimon ("Dimon"), was credited with turning around Bank One's profitability and reputation during his four-year tenure.

6.      Unwilling to yield the riches and power of his position, and desperate to shape a graceful conclusion to his career, Harrison pursued a business combination between JPMC and Bank One.

7.      In a stunning betrayal of shareholder trust, Harrison rejected the opportunity to merge with Bank One *without any acquisition premium at all*.

8.      According to persons close to the secretive negotiations surrounding the Merger, Harrison rejected such a merger of equals for no other reason than because Dimon sought to be CEO of the combined entity immediately.

9.      Instead, Harrison agreed to an exchange ratio providing for a massive premium over Bank One's market value – solely so he could retain his CEO position for two more years – then conspired with JPMC's wholly-owned (and fatally conflicted) financial advisor, defendant JPMSI, to conceal the nil-premium offer and to sell the high premium deal to JPMC's unsuspecting shareholders.

10.      After the Merger received shareholder approval, an independent investigation conducted by the *New York Times* revealed that:

> During the negotiations with Mr. Dimon, [Harrison] fought hard to give himself the two extra years, to secure a smooth transition, although he may have cost J.P. Morgan shareholders extra money in doing so.  Mr. Dimon, always the tough deal maker, **offered to do the deal for <u>no premium</u> if he could become chief executive immediately, according to two people close to the deal.**
>
> **When Mr. Harrison resisted, Mr. Dimon insisted on a premium**, which Mr. Harrison was able to push down to 14 percent.  The two men declined to comment on the specifics of their negotiations.  [Emphasis added.]

11.      To put this revelation into perspective, another reputable media source quoted one observer's view after the Merger was announced: "If JP Morgan announced

that Harrison was resigning and they had hired Jamie Dimon as the new CEO, the [JPMC] stock would have been up a few bucks."

12.     Thus, for the sole purpose of keeping his CEO title for another two years, Harrison caused JPMC shareholders to lose a multi-billion-dollar opportunity to combine with Bank One without unfairly harming JPMC shareholders' equity stake.

13.     However, Harrison's audacious entrenchment scheme could not be carried out alone. Without the participation of the Wall Street advisors whose blessing was necessary to assure JPMC shareholders, the scheme would not have succeeded.

14.     In a highly irregular and telling move, Harrison selected JPMSI as the financial advisor for JPMC in the Merger.

15.     JPMSI played a critical role in the scheme and violated federal securities laws by authoring and endorsing a misleading fairness opinion for inclusion in the Joint Proxy Statement-Prospectus, dated April 19, 2004 (the "Proxy/Prospectus"), which was disseminated to gain shareholder approval of the Merger.

16.     JPMSI extensively participated in the creation of the Proxy/Prospectus, which falsely characterized the nature of the Merger negotiations and omitted the critical fact that Harrison was offered but had rejected the opportunity to merge Bank One into JPMC using a nil-premium exchange ratio.

17.     As a result, JPMC investors were induced to believe that Harrison had bargained on their behalf to maximize their interest in the combined Company. In fact, Harrison had sold JPMC investors "down the river…just to save his own skin," as one observer put it.

18.    Unaware of the entrenchment scheme, and due to materially false and misleading written and oral statements as well as the failure to disclose material facts in the Proxy/Prospectus, shareholders of JPMC and Bank One approved the Merger, which was completed on July 1, 2004.

19.    Harrison and the other JPMC directors breached the fiduciary duties of loyalty and disclosure they owed to JPMC's shareholders by agreeing to an unfair exchange ratio in the Merger merely to entrench Harrison in the CEO office.  Despite its participation in the Merger negotiations and resultant knowledge of Harrison's rejection of the zero premium opportunity, JPMSI nevertheless aided and abetted the aforesaid breaches by creating the illusion of fairness and recommending the Merger.

20.    Plaintiff asserts claims under Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)], Rule 10b-5 promulgated thereunder [17 C.F.R. §§ 240.10b-5], and pendent common law claims.

## JURISDICTION AND VENUE

21.    This court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §§ 78a-78jj] and its supplemental jurisdiction [28 U.S.C. § 1367].

22.    Venue in this case is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], and 28 U.S.C. § 1391(b) and (c).  Acts giving rise to the violations of law complained of herein, including the dissemination to the investing public of false and misleading information, occurred in this District.

23.    In connection with the acts, conduct and other wrongs alleged in this Complaint, JPMSI, directly and indirectly, used the means and instrumentalities of

interstate commerce, including the mails, telephone communications and the facilities of national securities exchanges.

## THE PARTIES

24.    Plaintiff Samuel I. Hyland is a resident of New Castle County, Delaware. Plaintiff owned and sold JPMC common stock during the relevant time period, as set forth in the accompanying certification, incorporated by reference herein.

25.    Defendant JPMSI, a Delaware corporation, is a wholly owned subsidiary of J.P. Morgan Securities Holdings LLC, which, in turn, is a wholly owned subsidiary of JPMC.  JPMSI is a broker-dealer registered with the Securities and Exchange Commission ("SEC") and is a member of the National Association of Securities Dealers, Inc., the New York Stock Exchange ("NYSE") and other exchanges.  JPMSI acts as a primary dealer in U.S. government securities; makes markets in money market instruments and U.S. government agency securities; underwrites and trades corporate debt- and asset-backed securities, municipal bonds and notes, common and preferred stock, and convertible bonds offerings; advises on business strategies, capital structures and financial strategies; and structures derivative transactions.

## RELEVANT NON-PARTY PERSONS AND ENTITIES

26.    JPMC, a financial holding company incorporated under Delaware law in 1968 with its principal executive offices at 270 Park Avenue, New York, NY 10017, is a global financial services firm involved in investment banking, financial services for consumers and businesses, financial transaction processing, investment management, private banking, and private equity.  As of April 30, 2004, prior to the consummation of the Merger, there were 2.08 billion shares of the Company's common stock outstanding. JPMC's common stock is listed and traded on the NYSE under the ticker symbol "JPM."

27.     Lazard Frères & Co. LLC ("Lazard") served as financial advisor to Bank One in connection with the Merger.

28.     Harrison served as CEO and Chairman of the Board of Directors of JPMC from 1999 through the end of 2005. He remains Chairman of the Company. Harrison was instrumental in negotiating the Merger.

29.     Hans W. Becherer was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1998.

30.     Riley P. Bechtel was, during the relevant time, a director of JPMC. He was a director of JPMC from 1995 until the eve of the May 25, 2004 annual meeting.

31.     Frank A. Bennack, Jr. was, during the relevant time, a director of JPMC. He was a director of JPMC or a predecessor institution from 1981 until the consummation of the Merger on July 1, 2004.

32.     John H. Biggs was, during the relevant time, a director of JPMC. He has been a director of JPMC since March 2003.

33.     Lawrence A. Bossidy was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution since 1998.

34.     M. Anthony Burns was, during the relevant time, a director of JPMC. He has been a director of JPMC or a predecessor institution from 1990 until the eve of the May 25, 2004 annual meeting.

35.     Ellen V. Futter was, during the relevant time, a director of JPMC. She has been a director of JPMC or a predecessor institution since 1997.

36.     Helene L. Kaplan was, during the relevant time, a director of JPMC.  She was a director of JPMC or a predecessor institution from 1987 until the consummation of the Merger on July 1, 2004.

37.     Lee R. Raymond was, during the relevant time, a director of JPMC.  He has been a director of JPMC or a predecessor institution since 1987.

38.     William H. Gray, III was, during the relevant time, a director of JPMC.  He has been a director of JPMC or a predecessor institution since 1992.

39.     John R. Stafford was, during the relevant time, a director of JPMC.  He has been a director of JPMC or a predecessor institution since 1982.

40.     Harrison, Becherer, Bechtel, Bennack, Biggs, Bossidy, Burns, Futter, Gray, Kaplan, Raymond, and Stafford are referred to collectively herein as the "JPMC Directors."

41.     By virtue of their positions as directors of JPMC (and, in Harrison's case, as Chairman and CEO of JPMC as well), the JPMC Directors owed JPMC's shareholders fiduciary obligations and were required:  (a) to act in furtherance of the best interests of JPMC's stockholders; (b) to maximize stockholder value in the combination with Bank One; (c) to disclose to JPMC shareholders all material facts concerning the Merger; (d) to disseminate a complete and accurate proxy statement; and (e) to refrain from abusing their positions of control.

42.     Dimon was Chairman and CEO of Bank One prior to the Merger and now serves as CEO of JPMC.

## CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action on his own behalf and as a class action, pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of

the class (the "Class") consisting of those present and former JPMC shareholders who held common stock of JPMC at the close of market on January 14, 2004 but sold or otherwise disposed of any or all such stock after the Merger was announced.  Excluded from the Class is the Defendant herein; any person related to any of the JPMC Directors; any firm, trust, corporation, or other entity affiliated with any of the JPMC Directors or the Defendant (except for those holding JPMC common stock in solely a fiduciary capacity); the legal representatives, heirs, successors, and assigns of any excluded person; and any entity controlled by any excluded person.

44.    This action is properly maintainable as a class action.

45.    The members of the Class for whose benefit this action is brought are dispersed throughout the United States, and are so numerous that joinder of all class members is impracticable.  There were in excess of 2 billion shares of JPMC common stock outstanding as of April 30, 2004 held by thousands of JPMC stockholders who are members of the Class.  According to the Proxy/Prospectus:

> The board of directors of JPMorgan Chase has fixed the close of business on April 2, 2004 as the record date for determination of stockholders entitled to notice of and to vote at the annual meeting of stockholders. On the record date, there were 2,081,783,154 shares of JPMorgan Chase common stock outstanding, held by approximately 126,350 holders of record.

46.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly damaged by Defendant's wrongful conduct as complained of herein.  Among other things, members of the Class sustained damages as a result of a scheme and public statements issued in connection with the Merger that omitted and/or misrepresented material facts about the Merger that were required to be disclosed.

- 8 -

47.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and shareholder litigation.  Plaintiff has no interests that are in conflict with the interests of the Class.

48.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    Whether the federal securities laws were violated by the Defendant's acts as alleged herein;

b.    Whether the Proxy/Prospectus, and other documents and/or statements disseminated to members of the Class in connection with the Merger omitted or misrepresented material facts about the Merger that were required to be disclosed;

c.    Whether JPMSI acted with the requisite state of mind in participating in the scheme described herein and omitting to state and/or misrepresenting material facts about the Merger;

d.    Whether JPMSI aided and abetted the JPMC Directors' breaches of fiduciary duties owed to Plaintiff and other members of the Class; and

e.    Whether JPMSI participated in a civil conspiracy to violate the Exchange Act and Delaware common law; and

f.    Whether the members of the Class have sustained damages and, if so, what is the proper measure thereof.

49.    In addition, the Class will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine.  The market for JPMC common stock was at all times an efficient market for the following reasons, among others:

       a.       JPMC's common stock met the requirements for listing, and were listed on the New York Stock Exchange, a highly efficient securities market;

       b.       As a regulated issuer, JPMC filed periodic public reports with the SEC;

       c.       JPMC common stock trading volume was substantial during the class period;

       d.       JPMC was followed by numerous securities analysts who wrote reports available to investors through various automated data retrieval services;

       e.       JPMC disseminated information on a market-wide basis through various electronic media services; and

       f.       The market price of JPMC securities reacted efficiently to new information entering the market.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  As the damages suffered by many individual Class members may be small relative to the expense and burden of individual litigation, it is practically impossible for most Class members to seek individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

51.     Defendant acted in a manner which affects Plaintiff and all members of the Class alike, thereby making appropriate relief with respect to the Class as a whole.

52.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for

Defendant, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members or substantially impair or impede their ability to protect their interests.

## SUBSTANTIVE ALLEGATIONS

### Background: The Besieged Banker

53.     In June 1999, Harrison became CEO of Chase Manhattan, the predecessor of JPMC.  According to Harrison, "It's a lot more fun being a CEO than I would have guessed."  Liz Moyer, "Banker of the Year: Harrison Has the Helm," *The American Banker* (Feb. 1, 2001).

54.     According to the entry on Harrison in the *International Directory of Business Biographies* (St. James Press 2004):

> Harrison spent exorbitantly on an acquisitions spree,
> aiming to become a one-stop destination for meeting
> corporations' financial needs.  In 2000 the spree culminated
> in the $34 billion purchase of J.P. Morgan, a deal that
> created a major market contender with assets that ranked
> third behind only Citigroup and Bank of America.
> Commenting on the contention that he had paid too much,
> Harrison told *Market Week with Maria Bartiromo*, "You
> don't get any great property at a discount."

55.     An April 7, 2002 article in the *New York Times* suggested that Harrison's motivation in entering into large transactions was not necessarily to benefit shareholders:

> William B. Harrison was beaming. Mr. Harrison, as
> chairman of the Chase Manhattan Corporation, had signed
> a deal to buy J. P. Morgan & Company for $30.9 billion the
> night before and was already spinning the deal to
> shareholders. It was mid-September 2000, the economy
> was in its longest expansion ever, and anything seemed
> possible. "It's a very fair deal," he said, grinning
> uncharacteristically. "And most importantly, when we look
> at the overall transaction two years from now, it should be
> accretive to the shareholders."

Mr. Harrison had reason to grin — and still does, though
not because the bank's shareholders have gained as he
predicted. Rather than being "accretive" — that is,
increasing earnings per share — the merger has not
delivered much for shareholders so far; the stock has lost
more than one-third of its value in 18 months. Mr. Harrison
might have been glowing because, like many top
executives these days, he was about to be paid — a lot —
to go shopping.

For overseeing the acquisition of J. P. Morgan, which he
nonchalantly said took only three weeks to negotiate, he
received a special bonus of $20 million — far more than
the total lifetime earnings of the average working stiff. And
that bonus, which is spread over 2001 and 2002, came on
top of his $1 million salary and $5 million regular bonuses
last year and whatever else he receives for this year. Mr.
Harrison's three lieutenants, including Geoffrey T. Boisi, a
vice chairman who had joined Chase only four months
earlier, received special bonuses of $10 million each, on
top of their regular salaries and bonuses. All told, Chase
directors paid the bank's executives more than $50 million
for their outing at the bank mall. (They had done a little
window-shopping, chatting up Goldman Sachs and
Deutsche Bank, before settling on J. P. Morgan.)

56.    In connection with the merger that created JPMC, the Company's

compensation committee, comprised of Gray, Bechtel, Stafford, and Raymond, awarded

Harrison $10,000,000 in cash and 237,164 restricted stock units.  According to the March

19, 2002 report of the committee, included in the Company's 2002 proxy statement:

This award will vest and be paid out or distributed as
follows, subject to continued employment: 50% of the cash
and 50% of the restricted stock units in January 2002; 50%
of the cash in January 2003; and 50% of the restricted stock
units if the price of JPMorgan Chase common stock
achieves the $52 Target Price by January 25, 2007 (but no
sooner than January 25, 2003). The cash awards would be
paid out in the event of job elimination, death, or total
disability. The restricted stock unit awards would vest and
be distributed in the event of death or total disability. In the
case of job elimination or retirement, the restricted stock
unit awards related to the Target Price would vest only if

- 12 -

the Target Price is achieved, unless otherwise determined
by the committee.

57.    Thus, 118,582 of the restricted stock units, which would vest upon JPMC

achieving a target price by January 25, 2007, were "subject to continued employment."

If vested at the target price, the units would be worth over $6.1 million.

58.    Harrison was notorious not only for being overpaid but also for

overpaying in deal after deal.  As an interviewer noted in a February 23, 2004 interview

with Harrison on CNBC: "You acquired JP Morgan at the top of the equity bubble, you

acquired [Hambrecht & Quist] at the top of the technology bubble, Fleming [Asset

Management] at the top of the asset management bubble."

59.    A February 7, 2002 article in *Forbes* entitled "Is Harrison Breaking

Morgan's Bank?" reviewed Harrison's tenure, including its many failures, concluding

that "Fiscal 2002 will be the make or break."

60.    A June 7, 2002 article in *EuroWeek* entitled "Time for an outsider to shake

up troubled JP Morgan Chase" strongly criticized Harrison's leadership, pointed out his

poor, costly deals, and suggested that Harrison was due to lose his job:

> Look at the evidence. Today no one questions the fact that
> Chase's chairman and CEO, Billy Harrison, grossly
> overpaid for Flemings, the patrician but still itsy-bitsy UK
> asset manager with a quirky securities operation bolted on
> to the side. It was a brilliant deal for the Fleming family
> and blew the myth that Roddy Fleming couldn't cut a deal
> without the help of his childhood Scottish nanny. Billy
> Harrison would now probably admit that he was sold a bum
> steer with Flemings, but he might also blame the purchase
> on the recently departed Geoff Boisi, who was, after all, in
> charge of investment banking at the time.
>
> However, even if the unassuming Billy Harrison tries to
> evade the Flemings transaction by pointing an accusing
> finger at Geoff Boisi, this isn't quite the end of the story.

The harsh fact is that Chase and Billy Harrison had also significantly overpaid to acquire Geoff Boisi's investment banking boutique, Beacon Group, just because they clamoured for the services of its dynamic leader. It is perhaps even more ironic that Chase's attention was so focused on the brilliance of Mr Boisi that they may not have appreciated that David Coulter, who now has Boisi's old job, also came with the Beacon package.

If Chase's Billy Harrison paid over the top for Beacon Group and then Geoff Boisi made the Fleming family rich beyond their wildest dreams, shouldn't Chase shareholders have been wary about the next acquisition? Perhaps there was nothing wrong with putting JP Morgan out of its misery, and the JPM road pointed downhill all the way - but did Chase need to pay $34bn for the privilege? Yes, say the JP Morgan fat-cat top managers who walked away with fortunes which in some individual cases exceeded $100m each. No, say the Chase shareholders who must be asking themselves what they actually bought, other than a large can of worms.

The combined JP Morgan Chase in its present form is nowhere in investment banking, nowhere in equities and its asset management division can be described as fair to middling rather than the crème de la crème. Most of JP Morgan's old guard has left - who said "Thank heavens"? - and for its $34bn, Chase seems to have bought little more than a fizzy derivatives business and an upgrade in debt capital markets.

With such a litany of financial misjudgements, you would have thought that shareholders would be baying for blood. *At the top of the execution list you might have expected to see JPMC's chairman and CEO, Billy Harrison.* However, in the past fortnight it was Boisi who fell rather than Harrison, much to the amazement of most observers and certainly the bookmakers, who will lose a fortune if Harrison is still there by Christmas.

The situation regarding Mr Harrison is especially interesting to ourselves, and please be assured that we are not, and never have been, shareholders in either Chase Manhattan, JP Morgan or JP Morgan Chase.

*In the aftermath of Enron, Billy Harrison's press was so bad that at one time it didn't look as if he would last until*

*April* - remember those bounders and scallywags who said that the best double bet was for Billy Harrison and Credit Suisse's Lukas Muhlemann to be gone before the first polka dot bikini could be seen on the Côte d'Azure this summer.

But while Harrison has defied the bookmakers' odds so far, he must, unless he requires the services of a guide-dog, be able to see the writing on the wall. Chase Manhattan wasn't exactly the most sparkling bank in the universe. By adding Flemings, Beacon Group and JP Morgan, did Chase then become a world-beater? Not at all. Instead, the combined JP Morgan Chase was described to us by one Scottish fund manager as a dog's dinner - presumably a West Highland White or a Scottie?

That may be slightly unfair, but when you look at the JPMC share price, you have to ask yourself where it's going. Does he realise his own apparent shortcomings or the possible deficiencies of his subordinates, who are considered to be his most likely successors? We don't think so, when you read that **he intends to stay on for another seven years, ie until he is 65.**

We were almost speechless when we saw that comment, and in the world's main financial centres some irreverent bankers rolled around on the floor with laughter. One prominent private banker in Geneva said: "Mr Harrison must be living in cloud cuckoo land" - and in Switzerland they certainly know their cuckoos. In London, one notoriously aggressive proprietary trader commented: **"The odds on Billy Harrison lasting for seven years are longer than those on the United States winning the World Cup."** [Emphasis added.]

61.    An April 22, 2002 *BusinessWeek* article on Harrison entitled "The Besieged Banker" noted that Harrison was "under siege" due to his poorly timed, badly executed, and expensive deals and numerous disastrous loans. Despite JPMC's poor performance under his direction, the article observed that "Harrison stands to earn at least $16 million in merger-related bonuses if the stock recovers to $52, its price the day the [Chase-JP Morgan] deal closed. His top lieutenants will split $25 million more. And they have given themselves plenty of time to do it—until 2007, to be exact." Noting that

- 15 -

"[t]he execution of the J.P. Morgan merger wasn't much to write home about," the article

observed that:

> Unlike a steel mill or auto maker, a bank's assets are
> people, not plants.  But after paying top dollar for J.P.
> Morgan (3.5 times its book value), Harrison let its people
> walk.  Defections started as soon as the deal closed--despite
> hefty retention bonuses that could have yielded executives
> princely sums.  Within a year, 25 top former J.P. Morgan
> executives had left, and Chairman Douglas A. "Sandy"
> Warner III quit at the end of 2001.  "We would have liked
> some of them to stay," says Harrison.  "But I don't think it
> has cut into the core of what we're about."

62.    The article also observed internal criticisms of Harrison's poor

management:

> In interviews about management style, [JPMC] executives
> invariably quote [former General Electric Co. CEO Jack]
> Welch.  They preface answers with "As Jack says..." and
> few quote Harrison or even mention him unless they're
> asked.  As bank executives tell it, Harrison emphasizes
> what they call "the soft stuff"--management coaches, 360-
> degree reviews, discussing problems until everyone is
> singing in harmony.  Trouble is, Harrison has to be more
> than a choirmaster, he needs his managers to make their
> numbers.

63.    A subsequent January 13, 2003 article on Harrison in a *BusinessWeek*

report on "The Best & Worst Managers" noted that "Some investors speculate that

***Harrison could lose his job by the end of January*** if the bank's fourth-quarter results,

due out mid-month, don't show signs of improvement." (Emphasis added.)

64.    According to a January 19, 2004 article by Aaron Elstein in *Crain's New*

*York Business*: "One of Wall Street's favorite games for the past two years has been

guessing when William B. Harrison, the embattled chairman and chief executive of

[JPMC], would finally be shown the door."

65.     According to analyst Michael Mayo of Prudential Equity: "The biggest problem of [JPMC's] management, we believe, is lack of capital discipline when it comes to large strategic acquisitions…"  However, Harrison's lust for corporate conquest remained unfulfilled and he desperately needed a major event to salvage his career.

66.     The January 18, 2004 *Sunday Tribune* described Harrison's predicament:

[A] little more than 18 months ago Harrison's fortunes, and those of his bank, were so down in the dumps that *few would have given odds on him even surviving the year*, let alone clawing his way back to pull off one of the biggest banking mergers of all time.

Serious business downturns nearly always claim at least one banking casualty, and of the American banks, JP Morgan Chase looked easily the most vulnerable.

What's more, *it seemed to be largely Harrison's fault.* At the top of the bull market, he had forked out $ 32bn in Chase Manhattan equity to acquire JP Morgan. [Emphasis added.]

67.     From June 1999 (when Harrison became CEO of JPMC) to January 14, 2004 (the date the Merger was announced), the price of JPMC stock fell 18 percent, from $48.08 to $39.22.  By contrast, during the same period, the stock price of Citigroup (a large financial conglomerate and JPMC rival) climbed 66 percent and the S&P Financials index (an index of 81 large banks) rose 16 percent.

68.     Characteristic of JPMC's performance under Harrison was JPMC's September 17, 2002 announcement that its third-quarter earnings would be lower than analysts' expectations, causing shares to tumble as much as 13 percent.  JPMC also revealed that its bad loan portfolio was expected to climb by about $1 billion, up 40 percent; that trading revenues for July and August had fallen to just $100 million, compared to $1.1 billion for the full second quarter; and that the Company faced a potential $1 billion loss on its Enron surety bond claims.

69.    JPMC's involvement in financial scandal also has marked Harrison's tenure.  In particular, JPMC found itself targeted in securities litigation involving Enron, WorldCom, and initial public offering ("IPO") allocation.

70.    A July 22, 2004 *Wall Street Journal* article entitled "J.P. Morgan Results Damped by Scandals" reported that "despite the [M]erger and other steps to move beyond recent scandals, [JPMC] is still haunted by its ties to recent controversies."

71.    On September 18, 2002, the *Wall Street Journal* published an op-ed submission by Harrison in which he strongly rejected any charges of misconduct by JPMC under his leadership in connection with either the Enron fraud or the IPO allocation scandal.  Harrison concluded: "To say that [banks] contributed to or even condoned fraud, when the evidence indicates that they have been among the parties most damaged, only adds insult to injury."

72.    Despite Harrison's public protestation of complete innocence, on July 28, 2003, JPMC paid $135 million to settle an action commenced by the SEC, which charged that JPMC aided and abetted Enron's unlawful manipulation of its reported financial results through a series of complex structured finance transactions.

73.    On October 1, 2003, JPMC paid another $25 million to settle an action brought by the SEC in connection with JPMC's role in the IPO allocation scandal, involving allegations that numerous IPOs were manipulated by Wall Street investment banks to artificially inflate the market price of those securities and to conceal the amounts of compensation actually received by the underwriters.

74.    By late 2003, Harrison was desperate to buy himself time not only to retain the lucrative pay and prestige of the CEO position but also because he had 118,582

restricted stock units which would vest upon JPMC achieving a target price by January 25, 2007, but which were "subject to continued employment." If vested at the target price, the units would be worth over $6.1 million.

**Dimon's Destiny: If I Were King of a Megabank…**

75.     Dimon is known as the once protégé of Citigroup chief Sandy Weill. "By the mid-1990s, Dimon was Weill's heir apparent, says Mary McDermott, 60, a retired Citigroup senior vice president who worked with Weill for 34 years and has known Dimon since 1982. 'Jamie was indispensable to Sandy,' McDermott says. 'He was Sandy's alter ego.'" Edward Robinson, "J.P. Morgan's Dimon to Show Citigroup Who's Boss," *Bloomberg* (July 1, 2004). "'He was Sandy's intellectual torpedo,' says William McCormick, 63, a former American Express executive vice president. 'He worked on whatever issues were hot.'" *Ibid.* Under Weill's mentorship, Dimon developed a reputation as a shrewd operator as well as a powerful manager with immense credibility in the financial services industry.

76.     Dimon's entry in the *International Directory of Business Biographies* (St. James Press 2004) describes the dramatic arc of his ascent under Weill and his unceremonious ouster from Citigroup:

> **SHAPED BY A MENTOR**
>
> In 1978 Dimon graduated cum laude from Tufts University. He worked for the Management Analysis Center, a consulting firm in Boston, for several years and then enrolled in Harvard Business School. The Harvard professor Jay O. Light noted in *BusinessWeek*, "He was generally perceived as one of the very brightest guys in finance in that class" (October 21, 1996).
>
> While a student at Harvard, Dimon interned at Goldman Sachs and was offered a job there after graduation in 1982. He declined, instead going to work for the mentor who

would profoundly shape his career: Sandy Weill. The two men had met six years earlier; Weill knew Dimon's father and the two families had formed a close relationship, convening annually for Passover dinners. Dimon's mother gave Weill a copy of the college thesis her son had written about the 1970 merger of the two brokerage firms Shearson Hammill and Hayden Stone—a union engineered by Weill, who had been running Hayden at the time. Impressed, Weill offered Dimon a summer job. Recalled Weill in the *New York Times*, "After a week he was telling me how we could do things better" (July 13, 1995).

## BUILDING FROM THE GROUND UP

From 1982 to 1985 Weill and Dimon teamed up at American Express, where Dimon signed on as vice president and assistant to the president. Dimon's abilities to crunch numbers meshed well with Weill's people skills. When Weill was forced out of American Express, he made Dimon his second in command at the little-known consumer-lending outfit that he bought called Commercial Credit Company. That tiny firm was the beginning of what would eventually become Citigroup; as quoted by the *New York Times*, when asked about his decision to stay with Weill, Dimon replied, "I love the idea of being in on the ground floor" (July 13, 1995).

## RESTRUCTURING AN ULTIMATE WINNER

Dimon was a key member of the team that launched and defined Commercial Credit's strategy. He served as the company's chief financial officer and an executive vice president and then later as president. Through the course of Dimon's time at the firm, Commercial Credit was completely restructured and made numerous acquisitions and divestitures, substantially improving its profitability. The most significant transaction was the 1987 acquisition of Primerica Corporation, which included Smith Barney. Commercial Credit then assumed the Primerica name. In 1983 Primerica had acquired the Travelers Corporation (of which Smith Barney was a part), which had then been renamed Travelers Group. Between 1987 and 1994 the Travelers unit of Primerica touted compound annual growth of 21 percent in per-share earnings—an achievement that executives credited to Dimon's staunch financial discipline.

## EMERGING FROM MERGER AFTER MERGER

At Travelers, Dimon was named chairman and CEO of its Smith Barney subsidiary in January 1996, having previously served as COO and chief administrative officer. Dimon's father had once worked at Smith Barney, so the younger Dimon knew the firm well; he would help transform Smith Barney from a small brokerage into a major Wall Street player. He was put in charge of integrating Smith Barney with Shearson, the brokerage business that Smith Barney purchased in 1993. Dimon recalled the difficulty of extricating Shearson from Lehman Brothers, its former sister company, and from American Express, its old parent—comparing the process in the *New York Times* to "splitting apart Siamese twins" (July 13, 1995). Elsewhere he stumbled trying to build the company's investment-banking business, luring bankers from Morgan Stanley with exorbitant pay packages that robbed colleagues of a substantial portion of the bonus pool. Morale declined and dozens of bankers left the company. In January 1996 Dimon apologized to his team, as quoted by *BusinessWeek*: "I know I made mistakes, and I'm sorry. Let's move forward" (October 21, 1996).

## A PRECOCIOUS PERFORMER

Dimon quickly rebounded and in 1996 became the chairman and CEO of Travelers' Smith Barney subsidiary—at age 40 he was the youngest CEO of a major securities firm. His achievements included spearheading the firm's arrival on the Internet, making Smith Barney the only brokerage to tie into the widely used personal-finance software program Quicken, and pushing the company to become the first brokerage to offer no-load mutual funds to customers. As Dimon emerged from his mentor's shadow with the confidence to make his own decisions, tensions between the two began to surface. One insider who wished to remain anonymous noted in *BusinessWeek*, "Jamie's riding high on Smith Barney's success. He can hold stronger views than ever before" (October 21, 1996).

## NUMBERS ARE NOT EVERYTHING

A bullish market—along with Dimon's unrelenting focus on keeping costs down—continued to fuel Smith Barney's strong performance. In 1996 the company's return on equity was among the highest in the industry; in the second

quarter of that year it was a record 36.7 percent. In the fall of 1996 Smith Barney contributed 30 to 40 percent of its parents' earnings. Dimon's only demerit throught [*sic*] that period of time was his lack of people skills; during one meeting with 20 employees, as reported by *BusinessWeek*, Dimon openly disparaged one underling, saying, "That is the stupidest thing I ever heard" (October 21, 1996). An employee who witnessed the exchange noted, "It wasn't personal or mean spirited, but he would be more effective if he would lighten up" (October 21, 1996).

## TOO MANY MERGERS COMPROMISE QUALITY

In November 1997, with the merger of Smith Barney and Salomon Brothers, Dimon became cochairman and co-CEO of the combined firm. In 1998 Weill and Dimon engineered a $73 billion deal: Travelers Group, the brokerage and investment-banking and insurance giant they had created from humble beginnings, purchased the retail market leader Citicorp to form Citigroup. Their aim was nothing less than to transform the financial-services landscape by creating the first comprehensive financial-services behemoth with dealings in both the consumer and corporate banking markets.

For half a year after the $73 billion 1998 merger of Citicorp and Travelers, Dimon, Sir Deryck Maughan, and Victor Menezes were all given co-CEO status to supervise the investment-banking segment of Salomon Smith Barney (SSB). Under their watch SSB lost hundreds of millions of dollars in overseas markets and other risky bond investments.

## POWER STRUGGLES DESTROY A RELATIONSHIP

Concurrently the tension between Dimon and Weill reached a boiling point when Dimon refused to appoint Weill's daughter, Jessica Bibliowicz, as chief of asset management at Travelers and as well to turn over Salomon's bond business to Weill's son, Marc. A $1.3 billion trading loss in Dimon's Salomon division further exacerbated the situation. On November 1, 1998, the man Dimon had once referred to as a second father asked him to resign. Dimon said several years later in *Money* magazine, "It was a surprise. And yes, it was hard, because that company was my baby, my family" (February 2002).

Dimon had been forced out. Given the choice between his own children and his "adopted" son, Sandy Weill had favored his blood. Ironically both of Weill's children wound up leaving their father's firm.

The news of Dimon's departure seemed to stun Wall Street, which had expected Dimon to become chairman of Citigroup after Weill's retirement. Sally Krawcheck, the analyst at Sanford C. Bernstein & Company, told the Washington Post, "I was shocked, followed by terror about his resignation. I went through mourning, denial, all that stuff. This is a man who is tremendously respected" (November 3, 1998). In fact Dimon was so well respected that when he stepped onto the Salomon Smith Barney trading floor after handing in his resignation, one thousand traders responded by giving him a standing ovation. In the *Washington Post* a Salomon investment banker said, "We all wanted to hate him, but he turned out to be a real quality guy. He was thoughtful and always willing to spend time explaining" (November 3, 1998). In a coincidental twist, in 2003 Krawcheck joined Citigroup as director of research for its Smith Barney Division—the unit Dimon had helped build.

As far as Dimon was concerned, Weill's motivation in forcing out his right-hand man and protégé of 17 years was transparent. He compared the situation to a Shakespearean tragedy, casting himself as the Earl of Kent, who paid the price for challenging the authority of King Lear.

### TIED TO THE BANKING INDUSTRY

On March 27, 2000, after an 18-month break from the financial-services industry, Dimon became the chairman and CEO of Bank One, the fifth-largest bank in the country. Dimon said he turned down top jobs at Amazon.com and other coveted employers because banking was an inextricable part of his life. As he told *Money* magazine, he came to his decision after taking more than a year off: "I just took out that old white pad: Maybe I want to be an investor. Maybe I want to be a teacher. Maybe I want to write books. Maybe I want to stay home and be with my kids when they're growing up. I thought about all of that, and I was very open-minded about it, and what I came to is: My craft is financial services. Right or wrong, that's what I know, and I'm pretty good at it" (February 2002).

Dimon had been hired to turn around the ailing Bank One, which had been hit by a series of management missteps and earnings shortfalls beginning in 1999 that left the bank with a $511 million net loss in 2000. Dimon told the Lafayette (IN) Journal and Courier, "I want to make the company strong so it's a predator, not the prey" (April 3, 2000). Dimon backed up his words with cash, buying two million shares of his new company. He remarked in *Money* magazine, "Ownership is a critical thing. Even if you run a retail store, you think, 'Hey, it's my store, my company,' and you run it like it's your own. And I learned that from Sandy" (February 2002).

**A FOCUS ON COSTS BEGETS A TURNAROUND**

In his first year at Bank One, Dimon strengthened the management team and fortified the corporation's balance sheet, saving more than $1 billion through waste-reduction efforts. He severed relationships with corporate borrowers that failed to purchase the company's more profitable services, such as money management and stock underwriting, and closed the much-hyped but unprofitable online division, WingspanBank.com. Each of the company's 1,800 offices were ordered to post profit-and-loss statements, and branch managers were compensated based on net revenues, not sales. Dimon scrutinized every dollar the company spent. As reported by *Money*, when a high-level executive informed him of the numerous subscriptions held by the company, Dimon said, "You're a businessman; pay for your own Wall Street Journal" (February 2002).

During this period Dimon's conservative side emerged. After taking the reins at Bank One, he immediately implemented a complex risk-management system that left the company with a more diversified investment portfolio. The procedure put in place by that system led Bank One to reduce loans to WorldCom and other risky firms by billions of dollars—before the technology market tanked; Dimon's leadership was prescient. Effective May 2004 Dimon's former employer Citigroup agreed to pay $2.65 billion to settle a lawsuit brought by WorldCom investors, opening an expensive new chapter in the company's efforts to clean up after various corporate scandals.

Dimon judiciously turned down several possible deals. Household International, the struggling consumer-finance

company based in the Chicago area, went up for sale in 2002. Dimon was more than familiar with the firm's core business: like Commercial Credit, the outfit he had developed with Weill, Household offered loans to consumers with poor credit. But Dimon passed; Household was later sold to HSBC. Dimon told London's *Financial Times*, "I don't think we are ready to take on whole other business lines" (March 28, 2003).

77.    Despite Dimon's successful turn at the helm of Bank One, he was not content to lead a Midwestern financial institution; rather, he sought to reclaim the mantle of Wall Street superstar.  If he could not be chief of Citigroup, then he would parlay his Bank One success into becoming the head of some other Wall Street megabank.

78.    While JPMC shareholders endured Harrison's reign, Dimon created substantial value for Bank One shareholders.  From March 27, 2000, when Dimon became Chairman and CEO of Bank One, to just before the Merger was announced, the price of Bank One shares rose 41 percent, from $32.00 to $45.22.  During the same period, the price of JPMC stock fell 38 percent and the S&P Financials index increased only 18 percent.

**The Entrenchment Scheme : Merging Jupiter and Apollo**

79.    By late 2003, the fallout from various scandals entangling JPMC, as well as his poor business decisions, forced the besieged banker Harrison to conjure yet another massive deal to protect his position.

80.    According to an article published on July 7, 2004 by the online magazine *Slate* (owned by The Washington Post Co.) entitled "The $7 Billion Ego: Did J.P. Morgan Chase waste billions so its CEO could keep his job?":

> ***Harrison's grip at the helm was growing tenuous. But he saw salvation in yet another deal.***  Chicago-based Bank One, run by the charismatic Citigroup exile Jamie Dimon, seemed like a natural acquisition.  Dimon had pulled off an

>impressive turnaround at Bank One.  With his operational
>expertise and cadre of loyal bankers, Dimon could help
>improve morale and performance at Chase and eventually
>succeed Harrison. [Emphasis added.]

81.    During November 2003, Harrison and Dimon commenced negotiations concerning the possibility of a business combination between JPMC and Bank One. Among other things, Harrison and Dimon discussed the possible structure of such a transaction.  Each side retained legal and financial advisors in connection with the merger discussions.  JPMC retained JPMSI, its wholly-owned subsidiary, as its financial advisor for an extraordinary fee of $40 million.  As the Proxy/Prospectus itself admitted, "[JPMC's] Financial Advisor is an Affiliate of [JPMC] and May be **Deemed to Have Conflicts of Interest**."  (Emphasis added.)  This statement was misleading because JPMSI is not simply a JPMC affiliate; rather, it is a wholly-owned and controlled subsidiary.  Only by retaining a conflicted financial advisor could Harrison control the process and justify paying more than was necessary for Bank One.

82.    According to a January 17, 2005 article in *Investment Dealers Digest* entitled "Putting JPMorgan On the Map," the negotiations were conducted in the utmost secrecy "at an apartment in the Waldorf Towers, a sanctuary a few blocks from JPMorgan's midtown headquarters that the bank keeps as a permanent venue for quiet meetings with clients."  As the merger discussion proceeded, JPMSI and Lazard came up with the codenames of "Apollo" and "Jupiter" for Bank One and JPMC, respectively, to ensure the secrecy of the negotiations.

83.    According to a January 15, 2004 *CBS Marketwatch.com* article, "By December, according to a person at the table, Dimon and Harrison and a few other

executives huddled in the conference room of Bank One's M&A law firm, Wachtell Lipton Rosen & Katz."

84.    The *Investment Dealers Digest* article reports that: "Sources agree that Harrison and Dimon ironed out a lot of the deal's particulars together and that Dimon was clearly interested in succeeding Harrison from the get-go[.]"

85.    According to the Proxy/Prospectus, Harrison briefed the full Board on his discussions with Dimon at a meeting of the JPMC Directors on November 18, 2003 and the Company's board authorized Harrison to continue discussions regarding a possible business combination with Bank One.

86.    The January 19, 2004 *Financial Times* described the negotiation process:

> "There was a ***spectrum of outcomes in terms of premium and governance: Jamie laid them out*** and Bill was very responsive in December as the bid-ask spread narrowed," said another negotiator.

> But deal talks reached what one participant described as an "impasse" just before the Christmas holidays, as both parties stiffened their positions.

> Despite the earlier progress, negotiations hinged on finding a balance between two key issues: the price Mr. Dimon would extract for Bank One's shareholders - later fixed at a 14 per cent premium -- and the ***terms of his succession***. [Emphasis added.]

87.    Although Harrison wanted to merge JPMC with Bank One, he refused to relinquish his position as CEO.  Dimon, on the other hand, sought to be CEO immediately.

88.    Ultimately, Harrison agreed to an unfair exchange ratio in order to continue as CEO of the combined entity for two years after the Merger, with the expectation of remaining the Company's Chairman thereafter.  Little did JPMC shareholders know that this extra time for Harrison would cost them ***billions*** of dollars.

- 27 -

89.    Harrison would later claim that he offered a no-premium merger during the negotiations.  However, Harrison's claims omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  A January 26, 2004 *FORTUNE* article entitled "The Dealmaker and the Dynamo" detailed the negotiations and reported Harrison's claims:

> It was early January, and the merger talks between Jamie Dimon, CEO of Bank One, and William Harrison, his counterpart at J.P. Morgan Chase, were deadlocked. In the short time they'd been negotiating, Dimon, a brash boy wonder from Queens, and Harrison, a courtly Southern gentleman, had agreed on a host of issues. Succession was a snap: Dimon would get a virtually ironclad guarantee to replace Harrison as CEO in 2006. The board would be split fifty-fifty between Bank One and J.P. Morgan directors. Dimon's most trusted lieutenants would be given key roles in the merged company. Most of all, the two men agreed that if they could pull off this deal, combining Bank One's strong consumer businesses and J.P. Morgan's corporate banking franchise, they could create a true banking colossus—the second largest in America and one that could go toe to toe with giant Citigroup.
>
> What was hanging up the deal was the price. ***Harrison was offering what he calls a "market deal," meaning that J.P. Morgan would simply buy Bank One at its current stock price***—around $45 a share. His reasoning was simple. "We'd been criticized for overpaying on past deals, notably Chase's acquisition of J.P. Morgan in 2000," says Harrison. "I thought that if we paid a big premium again, the market would hammer our stock."
>
> Dimon, however, was demanding a markup north of 20%. Pointing to Bank of America's bid to buy FleetBoston for a gigantic 43% premium in late October, Dimon argued that Harrison would be getting a bargain at 20% to 25% over market. In vintage, ultra-enthusiastic Dimon style, the Bank One CEO insisted that the fit was so compelling that even with a big premium, the market wouldn't discount J.P. Morgan's stock. "Jamie was so excited by the combination that he thought he could sell a high premium deal to investors," says Harrison with a grin. "I disagreed." [Emphasis added.]

- 28 -

90.    However, after the Merger received shareholder approval, it was revealed that, in fact, Dimon had been willing to agree to a ***no-premium deal*** if he could be CEO of the combined company immediately.

91.    On June 27, 2004, the *New York Times* published an article by Landon Thomas, Jr., entitled "The Yin, the Yang and the Deal," which revealed that:

> During the negotiations with Mr. Dimon, [Harrison] fought hard to ***give himself the two extra years***, to secure a smooth transition, ***although he may have cost J.P. Morgan shareholders extra money*** in doing so. Mr. Dimon, always the tough deal maker, ***offered to do the deal for <u>no premium</u> if he could become chief executive immediately, according to two people close to the deal.***
>
> ***When Mr. Harrison resisted, Mr. Dimon insisted on a premium***, which Mr. Harrison was able to push down to 14 percent. The two men declined to comment on the specifics of their negotiations. [Emphasis added.]

92.    As revealed in "The Yin, the Yang and the Deal," Harrison had been presented with an option: (a) merge Bank One into JPMC using an exchange ratio of 1.153,[1] and serve as Chairman but not CEO of the combined Company; or (b) merge Bank One into JPMC using an exchange ratio of 1.32, and serve as both Chairman and CEO of the combined Company.  Harrison chose (b).  This secret deal, in effect an option which was exercised, was the most critical term of the Merger.

93.    For Harrison and Dimon this undisclosed provision was plainly the sine qua non of the Merger.  However, Harrison, Dimon, and their advisors, including JPMSI, understood that JPMC's shareholders would not have approved the Merger had they known of the entrenchment scheme.  In particular, JPMC shareholders would not have

---

[1] This exchange ratio would not have represented any premium over the market value of Bank One shares, based on the closing stock prices of JPMC and Bank One on January 14, 2004.  However, given the market's possible anticipation of merger synergies, this lower exchange ratio does not mean that Bank One's price per share would not have surged had the Merger been announced with a 1.153 exchange ratio.

preferred Harrison over Dimon as the CEO of the combined Company.  Moreover, as set forth below, a substantial number of JPMC shareholders specifically did not want the Chairman and CEO positions to be held by the same person.

94.    According to Landon Thomas, Jr., the financial advisors had actual knowledge of Dimon's willingness to agree to a zero-premium deal if he could be CEO immediately and the fact that Harrison turned down this opportunity in order to keep the CEO title.

95.    The June 27, 2004 *New York Times* article was the first opportunity for JPMC stockholders to have discovered that Harrison had turned down a no-premium opportunity and that he and JPMSI had engaged in a deceptive entrenchment scheme.

96.    A January 15, 2004 *CBS Marketwatch.com* article is consistent with this account: "The [merger] talks ran through Christmas week and during that time, the stickiest issue, succession, was resolved by the two-year compromise."  However, while this account, the January 19, 2004 *Financial Times* article, and the January 26, 2004 *FORTUNE* article entitled "The Dealmaker and the Dynamo" all corroborate the portrait of the negotiations in the June 27, 2004 *New York Times* article, none of the previous articles revealed or even suggested the entrenchment scheme.

97.    With the unfair exchange ratio agreed upon in exchange for a guarantee of his continuation as CEO, Harrison presented the proposed Merger to the other JPMC Directors, who knew or should have known about the *quid pro quo*.  Nevertheless, after receiving JPMSI's misleading opinion that the deal was fair, the JPMC Directors approved the Merger.

98.     After the close of trading on January 14, 2004, JPMC and Bank One

issued a joint press release (the "Press Release") announcing their agreement to merge:

> NEW YORK and CHICAGO, January 14, 2004 - J. P. Morgan Chase &
> Co. (NYSE: JPM) and Bank One Corporation (NYSE: ONE) today
> announced that they have agreed to merge in a strategic business
> combination establishing the second largest banking franchise in the
> United States, based on core deposits. The combined company will have
> assets of $1.1 trillion, a strong capital base, 2,300 branches in seventeen
> states and top-tier positions in retail banking and lending, credit cards,
> investment banking, asset management, private banking, treasury and
> securities services, middle-market, and private equity. With balanced
> earnings contributions from retail and wholesale banking, the combined
> company will be well-positioned to achieve strong and stable financial
> performance and increase shareholder value through its balanced business
> mix, greater scale, and enhanced efficiencies and competitiveness.
>
> The agreement, which has been unanimously approved by the boards of
> directors of both companies, provides for a stock-for-stock merger in
> which 1.32 shares of JPMorgan Chase common stock will be exchanged,
> on a tax-free basis, for each share of Bank One common stock. Based on
> JPMorgan Chase's closing price of $39.22 on Wednesday, January 14,
> 2004, the transaction would have a value of approximately $51.77 for each
> share of Bank One common stock, and would create an enterprise with a
> combined market capitalization of approximately $130 billion. The
> premium, based upon the average closing stock prices of JPMorgan Chase
> and Bank One for the previous month, would be approximately 8 percent
> and would be approximately 14 percent based on today's closing prices.
>
> Under the agreement, the combined company will be headed by William
> B. Harrison, 60, as Chairman and Chief Executive Officer, and by James
> Dimon, 47, as President and Chief Operating Officer, with Mr. Dimon to
> succeed Mr. Harrison as CEO in 2006 and Mr. Harrison continuing to
> serve as Chairman. The company's sixteen-member Board of Directors
> will have fourteen outside directors, seven each from JPMorgan Chase and
> Bank One, plus Messrs. Harrison and Dimon. …

99.     As one observer related on *eFinancialNews.com* on February 8, 2004,

after hearing the announcement of the Merger:

> One of the first calls I received was: "That's a hell of a price that Bill
> Harrison is paying to recruit Jamie Dimon."
>
> …

> ***Has Harrison sold JP Morgan Chase down the river to Bank One and
> Dimon just to save his own skin?*** [Emphasis added.]

100.    The Press Release made no mention at all of Harrison's rejection of the
opportunity to merge Bank One into JMPC without any acquisition premium.  Nor did it
disclose that Harrison agreed to the premium solely to give himself two more years as
CEO of JPMC.  Accordingly, the Press Release omitted to state material facts necessary
in order to make the statements made, in the light of the circumstances under which they
were made, not misleading.

101.    Also, the Press Release falsely represented that Harrison would head the
combined Company, when, in fact, Dimon would be the true CEO of JPMC even though
he would not have the CEO title "on paper."

102.    Within minutes of the announcement of the Merger, JPMC shares fell 4
percent to $37.50 at 4:47 p.m. in after-market trading, from a market closing price that
day of $39.22.  The drop reflected the unnecessarily dilutive impact of the Merger.  By
contrast, in early trading the next day, Bank One shares rose $6.28, or nearly 14 percent.

103.    On January 17, 2004, Ian Kerr of *eFinancialNews.com* commented on the
deal:

> Do not doubt for a minute that the real winner in the proposed merger
> between JP Morgan Chase and Bank One is Jamie Dimon. Without his
> presence there would have been no deal. Dimon returns to New York in
> triumph after being dumped by Sandy Weill, his former boss at Citigroup.
> ***For JP Morgan, Dimon's arrival is a blessing because William
> Harrison, chairman and chief executive, has never looked to be more
> than a part-time caretaker.*** The line managers below him were described
> to me by a former Morgan banker as "a rum bunch who spend too much
> time squabbling with each other".
>
> …
>
> ***Harrison, who is not due to retire for two years, will be the nominal
> leader and, on paper at least, Dimon's boss. However, senior sources***

> **within JP Morgan Chase and Bank One confirm that Dimon will be
> calling most of the shots.** "It is now the Dimon show and he knows that he
> has the full support of Harrison and the JP Morgan Chase board. You
> won't even have to wait until the summer to see some big personnel
> changes, which will all have Dimon's stamp on them," said a partner in
> one of Wall Street's most prestigious law firms, who has been a friend of
> Dimon since his early days as a protege of Weill. [Emphasis added.]

104.    As reported in the March 23, 2006 article "In This Corner! The

Contender" in *FORTUNE* magazine:

> Harrison, who was scheduled to stay on as CEO through
> June 2006, quickly ceded day-to-day control. In October it
> was announced that Dimon would take the helm in January,
> six months ahead of schedule (Harrison remains chairman).
> **The truth is, he has been in charge from the moment he
> walked in the door.** [Emphasis added.]

105.    Harrison acknowledged Dimon's considerable experience with mergers in

an interview on CNBC: "Well, I would just say again that Jamie and I have been through

as many mergers over the last ten years as any two executives out there combined."

Thus, any claim that there was a business justification for Harrison to be CEO in order to

secure a smooth transition in connection with the Merger is mere pretext.

106.    Confirming that there was no business justification or need for Harrison to

be CEO, JPMC's stock price rose substantially after it was announced that Dimon would

take the CEO title earlier than planned. As reported in the January 25, 2006 *Wall Street

Journal*: "When reporting third-quarter results, J.P. Morgan disclosed that president and

operating chief Jamie Dimon would take over as CEO on Jan. 1, [2006,] six months

ahead of schedule. The move helped sent J.P. Morgan's slumping stock rocketing higher

over the next three months."

107.    The proposed acquisition of Bank One in a stock-for-stock transaction

required the approval of JPMC's shareholders, as an amendment to JPMC's certificate of

incorporation was necessary for JPMC to have the corporate authority to issue the shares necessary for the exchange.

108.    When the Merger was announced, the acquisition premium for Bank One shares amounted to approximately 14 percent, based on that day's closing prices. In other words, to merge with Bank One, JPMC shareholders would be asked to fund the Merger premium of more than $7 billion in stock, resulting in a substantial reduction of their equity allocation. The total value of the deal was approximately $57 billion.

109.    None of the Merger "consideration" came from the Company itself; rather, the stock issued in connection with the Merger, including the stock issued to cover the unnecessary premium, directly lessened the stake of JPMC's pre-Merger shareholders in the resultant entity. Thus, while the equity stake of JPMC's pre-Merger shareholders in the resultant entity was reduced by the premium, the Company itself was not affected in any way. Indeed, neither the Company's assets nor its liabilities nor its income nor its cash flow (nor any other quality in which a corporation can be said to exist) could have been affected in any way by the premium, no matter how large or how small. By contrast, the size of the premium directly impacted the percentage of the combined Company held by JPMC's pre-Merger shareholders.

110.    Public criticism of the Merger's premium was immediate. When the Merger was announced, Lawrence Kudlow observed on CNBC's Kudlow & Cramer show: "[S]ome people I spoke to today said this is too dilutive. They said JP Morgan is paying too big a premium. It's great for Bank One shareholders but it's not great for JP Morgan Chase, [JPMC predecessor] Manny Hanny, [JPMC predecessor] Chemical shareholders, etc."

111.    James Cramer of Kudlow & Cramer discussed the Merger announcement with Lehman Brothers Bank Analyst Brock Vandervliet on CNBC:

> CRAMER: We're all getting pretty smart, Brock, about the idea when two mergers of equals get together that one is more equal than the other, to use kind of an Orwellian view.  When NationsBank merged in with Banc of America, it turned out to be the Nations guys, even though it turned out to be Banc of America to be the title.  Who wins in this culture clash?
>
> Mr. VANDERVLIET: I would favor Bank One and Bank One management.
>
> CRAMER: Isn't that something, Lawrence, that JP Morgan, the bluest chip of blue chips--that it's the Bank One upstarts that take it over?
>
> KUDLOW: Well, I know.  It's an odd -- a lot of people -- I mean, this is kind of an interesting thing because of what it says about both sides.  I mean, Dimon, I guess, is the powerhouse manager here.

112.    Ruchi Madan, a bank analyst at Citigroup's Smith Barney subsidiary, noted that "the 14% premium to [Bank One's] close may seem high…"

113.    Under the heading "Not a Cheap Acquisition – But Has Harrison Ever Bought a Bargain?", a Natexis Bleichroeder analyst commented: "We believe JPM's shareholders will be relieved to hear that Bank One's Dimon is expected to take control of the combined company in 2006, given Harrison's missteps in the last few years."

114.    The market recognized that, although the Merger was structured as an acquisition, with an acquisition premium, it was, in reality, a merger of equals at best, with the balance tipping in Dimon's favor.  Many observers considered Dimon to be the de facto CEO.  All that distinguished the Merger from a true merger of equals was Harrison's ability to call himself CEO for another two years and the multi-billion-dollar premium unknowingly funded by JPMC shareholders to secure that benefit for Harrison.

115.    JPMSI created or participated in the creation of a January 15, 2004 presentation to shareholders entitled "Creating Scale, Balance and Shareholder Value."

The presentation stated that "Value of cost savings [in the Merger] exceeds premium." This statement has been shown to be false, as the Company's financial performance in the wake of the Merger has disappointed investors; thus far the Merger's cost savings have not exceeded the multi-billion-dollar premium. The presentation also misleadingly claimed that the Merger would produce "Value creation for all shareholders" and represented "A Compelling Value Proposition for Shareholders." These statements omitted to state material facts (such as that Harrison rejected the opportunity to merge Bank One into JPMC without paying any premium) necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

116.    In connection with the Merger, JPMC amended its by-laws to include the following provisions:

Section 2.09. CEO Position and Succession; Board Composition. (a) The Board of Directors of the Corporation has resolved that, effective as of the Effective Time (as defined in the Agreement and Plan of Merger, dated as of January 14, 2004, by and between the Corporation and Bank One Corporation ("Bank One"), as the same may be amended from time to time (the "Merger Agreement")), Mr. William Harrison shall continue to serve as Chairman of the Board and Chief Executive Officer of the Corporation and Mr. James Dimon shall become the President and Chief Operating Officer of the Corporation. The Board of Directors of the Corporation has further resolved that Mr. Dimon shall be the successor to Mr. Harrison as the Chief Executive Officer of the Corporation, with such succession to become effective on the second anniversary of the Closing Date (as defined in the Merger Agreement) or any such earlier date as of which Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer of the Corporation (the date of such succession, the "Succession Date"), and that Mr. Harrison shall continue to serve as Chairman of the Board following the Succession Date.

(b) Effective as of the Effective Time, the Board of Directors of the Corporation shall be comprised of eight Continuing Bank One Directors, including Mr. Dimon, and eight Continuing JPMorgan Chase Directors, including Mr. Harrison. From and after the Effective Time through the Succession Date: (i) the number of directors that comprises

the full Board of Directors of the Corporation shall be sixteen; and (ii) all vacancies on the Board of Directors created by the cessation of service of a director shall be filled by a nominee proposed by the Governance Committee of the Board of Directors, which shall be co-chaired by one Continuing Bank One Director and one Continuing JPMorgan Chase Director and comprised of an equal number of Continuing Bank One Directors and Continuing JPMorgan Chase Directors (any deadlocks on the Governance Committee shall be resolved in good faith by the non-management members of the Board of Directors in a manner intended to preserve the principles of representation reflected in this By-law.). For purposes of this Section 2.09, the terms "Continuing JPMorgan Chase Directors" and "Continuing Bank One Directors" shall mean, respectively, the directors of the Corporation and Bank One who were selected to be directors of the Corporation by the Corporation or Bank One, as the case may be, as of the Effective Time pursuant to Section 5.10 of the Merger Agreement.

(c) (i) The removal of Mr. Dimon from, or the failure to appoint or re-elect Mr. Dimon to, any of the positions specifically provided for in this Section 2.09 and in the employment agreement between the Corporation and Mr. Dimon (the "Employment Agreement"), and any amendment to or termination of the Employment Agreement, prior to the Succession Date, (ii) any determination not to appoint, or any failure to appoint, Mr. Dimon as Chief Executive Officer of the Corporation on the Succession Date, (iii) the removal of Mr. Harrison from, or the failure to appoint or re-elect Mr. Harrison to, the position of Chairman of the Board and Chief Executive Officer of the Corporation prior to the Succession Date or (iv) any determination not to nominate Mr. Harrison or Mr. Dimon as a Director of the Corporation, prior to the Succession Date, shall each require the affirmative vote of at least 75% of the full Board of Directors.

(d) The provisions of this Section 2.09 may be modified, amended or repealed, and any By-law provision inconsistent with the provisions of this Section 2.09 may be adopted, only by an affirmative vote of at least 75% of the full Board of Directors. In the event of any inconsistency between any provision of this Section 2.09 and any other provision of these By-laws or the Corporation's other constituent documents, the provisions of this Section 2.09 shall control.

117.    The Proxy/Prospectus summarized the Merger-related amendments to the

Company's by-laws as follows:

The by-laws of JPMorgan Chase will be amended, effective not later than the completion of the merger, to add a new by-law providing the following:

• that the board of directors has resolved that, effective as of the completion of the merger, Mr. Harrison will continue to serve as Chairman of the Board and Chief Executive Officer of JPMorgan Chase and Mr. Dimon will become the President and Chief Operating Officer of JPMorgan Chase; and that Mr. Dimon will be the successor to Mr. Harrison as the Chief Executive Officer of JPMorgan Chase, effective on the second anniversary of the completion of the merger or any such earlier date as of which Mr. Harrison ceases for any reason to serve in the position of Chief Executive Officer of JPMorgan Chase, and that Mr. Harrison will continue to serve as Chairman of the Board following that succession;

• that on the effective date of the merger, the board of directors will be comprised of eight Bank One directors, including Mr. Dimon, and eight JPMorgan Chase directors, including Mr. Harrison;

• that until the date of Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, the number of directors that comprises the full board of directors of JPMorgan Chase will be sixteen; and

• that until Mr. Dimon's succession as Chief Executive Officer of JPMorgan Chase, all vacancies on the board of directors created by the cessation of service of a director will be filled by a nominee proposed by the governance committee of the board of directors, which will be co-chaired by one former Bank One director and one former JPMorgan Chase director and comprised of an equal number of former Bank One directors and former JPMorgan Chase directors (any deadlocks on the governance committee will be resolved in good faith by the nonmanagement members of the board of directors in a manner intended to preserve the principles of representation reflected in the new by-law).

The by-laws will provide that the affirmative vote of at least 75% of the full board of directors will be required for any of the following:

• the removal of Mr. Dimon from, or the failure to appoint or re-elect Mr. Dimon to, any of the positions specifically provided for above and in his employment agreement with JPMorgan Chase, and any amendment to or termination of his employment

agreement, prior to Mr. Dimon's succession as Chief
Executive Officer of JPMorgan Chase, or any
determination not to appoint, or any failure to appoint, Mr.
Dimon as Chief Executive Officer of JPMorgan Chase on
that date of succession,

•      the removal of Mr. Harrison from, or the
failure to appoint or reelect Mr. Harrison to, the position of
Chairman of the Board and Chief Executive Officer of
JPMorgan Chase prior to Mr. Dimon's succession as Chief
Executive Officer of JPMorgan Chase,

•      any determination not to nominate Mr.
Harrison or Mr. Dimon as a director of JPMorgan Chase
prior to Mr. Dimon's succession as Chief Executive Officer
of JPMorgan Chase, and

•      any modification, amendment or repeal of,
or any adoption of any bylaw provision inconsistent with,
the provisions of the by-law amendments described above.

118.    In addition to entrenching himself with the CEO title, Harrison secured for

himself an extraordinarily lucrative severance package, as noted in the Proxy/Prospectus:

[I]n connection with the [Merger], the severance policy for Mr. Harrison
will be amended, effective upon completion of the merger, so that Mr.
Harrison's severance will be the greater of (a) $22.2 million or (b) three
times his current base salary and three-year average annual cash
performance bonus if he is terminated involuntarily without cause prior to
the second anniversary of the completion of the merger.

119.    Despite the premium agreed upon in connection with the Merger, the

combination of JPMC and Bank One was in all other respects a merger of equals, for

which little or no premium was appropriate.

120.    According to an Institutional Shareholder Services report analyzing the

Merger: "The board and management considerations detailed…under the bylaw

amendments indicate a merger of equals deal."

121.    Deutsche Bank Securities analyst Thomas McCandless noted:

On the surface, this deal looks a lot more like a *merger of equals*, given the equal split in outside board of directors and the near even split among targeted members of the new executive committee. This is interesting and apparently *highly beneficial to ONE shareholders* considering it appears that ONE will represent only about 40-42% of the shares, 30-35% of the combined deposits, 38% of loans, 34% of the equity and only 26% of the pro forma assets. [Emphasis added.]

122.    Harrison himself endorsed this view at a January 15, 2004 town hall meeting concerning the Merger, during which he stated: "[T]he way we did it was doing a deal that had merger vehicle characteristics, but we're calling this a merger, we're not calling it a purchase."

123.    JPMSI stated in the Proxy/Prospectus that the 1.32 exchange ratio agreed to in connection with the Merger significantly exceeded the "implied exchange ratio from contribution" based on a variety of financial metrics, confirming the unfairness of the exchange ratio.  However, the Proxy/Prospectus concealed from JPMC shareholders the *reason* for this apparent unfairness.

124.    JPMSI's valuation analysis in the Proxy/Prospectus disclosed the following:

| | Pro Forma Ownership by JPMorgan Chase Stockholders | Pro Forma Ownership by Bank One Stockholders | Actual Exchange Ratio in Merger |
|---|---|---|---|
| | 57.8% | 42.2% | 1.320 |
| | Contribution by JPMorgan Chase | Contribution by Bank One | Implied Exchange Ratio from Contribution |
| 2004 GAAP net income | 63.3% | 36.7% | 1.056 |
| 2004 cash net income | 63.5 | 36.5 | 1.051 |
| Tangible equity | 63.0 | 37.0 | 1.073 |
| Market value | 61.4 | 38.6 | 1.148 |

125.    It follows from JPMSI's analysis that the Merger exchange ratio exceeded the highest point in the range of reasonableness and/or fairness, based on a comparison against exchange ratios implied from various other metrics, as set forth above.

126.    The valuation analysis by Lazard in the Proxy/Prospectus disclosed the following:

| | Bank One % | JPMorgan Chase% | Implied Exchange Ratio | Premium/ (Discount) to Bank One |
|---|---|---|---|---|
| **Income Statement** | | | | |
| GAAP (I/ B/ E/ S) | | | | |
| Estimated 2003 | 34.6% | 65.4% | 0.973x | (15.1)% |
| Estimated 2004 | 36.7 | 63.3 | 1.060 | (7.5) |
| Cash Earnings (I/ B/ E/ S) | | | | |
| Estimated 2003 | 34.6% | 65.4% | 0.972x | (15.3)% |
| Estimated 2004 | 36.6 | 63.4 | 1.057 | (7.8) |
| **Balance Sheet (as of September 30, 2003)** | | | | |
| Total Assets | 26.8% | 73.2% | 0.677x | (41.0)% |
| Risk-Weighted Assets | 33.1 | 66.9 | 0.912 | (20.4) |
| Loans | 37.5 | 62.5 | 1.097 | (4.3) |
| Deposits | 34.3 | 65.7 | 0.958 | (16.4) |
| Common Stockholders' Equity | 33.3 | 66.7 | 0.918 | (20.0) |
| Tangible Common Stockholders' Equity | 36.3 | 63.7 | 1.044 | (8.9) |
| Tier 1 Capital | 35.8 | 64.2 | 1.023 | (10.8) |
| Ownership at 1.320x exchange ratio | 42.2% | 57.8% | 1.320x | 15.1% |

127.    It follows from Lazard's analysis that the Merger exchange ratio exceeded the highest point in the range of reasonableness and/or fairness, based on a comparison against exchange ratios implied from various other metrics, as set forth above.

128.    Revealing that the Merger's exchange ratio offered an unreasonable, extraordinary, and unfair premium compared to similar transactions (indeed, only the premium in the merger between Fleet Financial Group, Inc. and BankBoston Corporation

was comparable), the valuation analysis by Bank One's banker in the Proxy/Prospectus also disclosed the following analysis of premiums in comparable transactions:

| | Announcement Date | 1-Day Premium (%) | Ownership (%) |
|---|---|---|---|
| JPMorgan Chase/ Bank One | 1/14/04 | 15 | 58/42 |
| Travelers Property Casualty Corp. / The St. Paul Companies, Inc. | 11/17/03 | 1 | 66/34 |
| First Union Corporation / Wachovia Corporation | 4/15/01 | 7 | 73/27 |
| Fleet Financial Group, Inc./ BankBoston Corporation | 3/14/99 | 16 | 62/38 |
| Norwest Corporation/ Wells Fargo & Company | 6/8/98 | 9 | 47/53 |
| NationsBank Corporation / BankAmerica Corporation | 4/13/98 | 0 | 54/46 |
| Banc One Corporation / First Chicago NBD Corporation | 4/13/98 | 6 | 60/40 |
| Travelers Group Inc. / Citicorp | 4/6/98 | 8 | 50/50 |
| Dean Witter, Discover & Co./ Morgan Stanley Group Inc. | 2/5/97 | 11 | 55/45 |
| Chemical Banking Corporation / The Chase Manhattan Corporation | 8/28/95 | 7 | 58/42 |

129.    According to Michael L. Mayo, a banking analyst at Prudential Securities, JPMC stock had the poorest performance of 17 bank stocks he examined.  In third place was Bank One, which has returned 13 percent since Dimon became CEO in March 2000. Comparing JPMC's performance while Harrison was CEO against the performance of Bank One under Dimon reveals the absurdity of even suggesting that Harrison's service as CEO for two more years was worth billions of dollars.

130.    Despite his poor leadership, Harrison was compensated handsomely -- in 2001, for instance, Harrison was the top paid executive of any public company even though during that year JPMC's stock price fell 20 percent, net profits plunged 70 percent, and layoffs mounted.  Excluding stock option awards and stock sales, in 2001, Harrison was paid a salary of $1 million, a bonus of $5 million, an additional "merger-

related award" of $5 million, and a restricted stock award valued at $5 million -- a total of $16 million.

131.    Harrison himself acknowledged the underperformance of JPMC under his leadership in the June 27, 2004 *New York Times* article:

> In Mr. Dimon, [Harrison] may have found an ideal successor -- a Wall Street hero who can recharge J. P. Morgan's flagging reputation among investors.
>
> Although his board stood by him through the brutal times, Mr. Harrison acknowledged that he had a limited time to turn things around.  "If we had gone another year without performing, the board probably would have demanded changes," he said, leaning back in a plush chair in his office. "There is a point at which you can't go on.  But in the end, I presume that they liked my leadership."

132.    Numerous comments by analysts and the press confirm that a significant rationale for the Merger was Dimon's perceived leadership role in the combined entity.

133.    "This deal's all about Jamie Dimon," said Jon Burnham of Burnham Asset Management. "That was the price of JP Morgan getting Jamie Dimon to be the next chief executive.  I guess he is going to be running the show from day one."

134.    London's *Sunday Telegraph* reported on January 18, 2004:

> JP Morgan's shares gained 30 cents on news of the deal, but as one arb put it to me: ***"If JP Morgan announced that Harrison was resigning and they had hired Jamie Dimon as the new CEO, the stock would have been up a few bucks."*** [Emphasis added.]

135.     "The sense on the street is that the day-to-day operations will be run by Jamie," observed Robert Maneri, a fund manager at Victory Capital Management in Cleveland, specializing in bank stocks. "We have a lot of faith in him."

136.    "It does seem from indications I'm getting that Jamie Dimon is calling the shots," related Jeff Harte, an analyst at Sandler O'Neill & Partners LP.

137.    According to James McGlynn, a manager at Summit Fund in Cincinnati, which owns JPMC stock and owned Bank One: "Jamie will run the show."

138.    An April 19, 2005 article in *Bloomberg* reported the following comment: "'He is their future,' said Jack Welch, the former CEO of General Electric Co., who has worked as a consultant to JPMorgan, in an interview. 'He's the new guy. It's his company.'"

139.    The June 27, 2004 *New York Times* article observed, "William Harrison may be the acquirer in the [Merger], but it is becoming clear that James Dimon and his posse will call many of the shots."

140.    The *Australian* reported on January 16, 2004:

"JP Morgan's board might have been saying: 'Go get me a strong CEO'," said Robert Morris, director of equity investments at Lord Abbett & Co[....]" "Dimon brings a new broom to JP Morgan, which has a lot of management issues."

141.    *Retail Banker International* reported on February 11, 2004 that, despite Harrison's retention of the CEO title, "[w]ord is that Dimon will, however, be very quickly taking over from his Morgan counterpoint." *Retail Banker International* quoted Piper Jaffray senior bank analyst Andrew Collins: "We are enthusiastic about the appointment of Jamie Dimon to the post of chief executive in 2006, as it should be viewed extremely positively." The article noted that this was "an opinion echoed by other analysts who rate Dimon highly for the way that he has improved the position of the formerly struggling Bank One." According to *Retail Banker International*: "Wall Street has meanwhile given almost universal praise to the Morgan decision to hand over the reins of power of the merged group to Bank One's Jamie Dimon."

142.    *Retail Banker International* further observed:

- 44 -

Dimon, only 47, can certainly inject the energy that perhaps 60-year-olds like Harrison will increasingly be lacking. Indeed, word is that he will be running the combined bank more or less from day one as Harrison quickly arranges a smooth transition process. It is expected that Dimon will oversee the operations of the combined entity after the Merger is consummated.

143.    The CEO issue arose several times during the conference call held by Harrison and Dimon on January 15, 2004 to explain the Merger to the investment community.  One analyst specifically asked Harrison:

With regard to separating the Chairman and CEO positions, I think that is best practices from a corporate governing standpoint, but why are you CEO for two years and doing this tag team thing? Why not just go directly to Chairman and have Jamie be CEO right away? What was your thought process there?

144.    Harrison's evasive answer omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading:

It's all part of creating a structure in a negotiation process that works for both firms.  I am 60 years old. I have at least a couple of years left to produce value and we think this is a good balance.  And as I said before, I will stay around as Chairman as long as Jamie wants me.

145.    Harrison's answer specifically concealed that he had preserved his CEO title only by agreeing to a massive premium in connection with the Merger, at the expense of pre-Merger JPMC shareholders.  Despite Harrison's assertion that the two-year arrangement represented "a good balance," he specifically concealed that he had obtained his two additional years by rejecting a zero premium exchange ratio.

146.    Another analyst on the January 15, 2004 conference call also probed the specific issues of succession and titles:

Mr. Dimon, you talked about the fact that you are going to become CEO in two years. The question is obviously, why you didn't decide to move

- 45 -

for that now, as you know, things can change a lot in two years based on your experience?

147.   Dimon's response to this question omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading:

> You've got to think a little bit that these are two large organizations coming together.  You want the teams to meld.  I have a lot to learn there.  Bill and I have known each other a long time so we feel pretty comfortable about this and I'm convinced this will work.

148.   Harrison's failure to respond to this clear question, which demonstrated shareholder interest in the two-year arrangement, also represented a failure to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  In fact, Harrison knew that Dimon *had* sought the CEO position immediately.

149.   Despite these clear questions, Harrison concealed that, in fact, he had contemplated a merger of equals with no premium at all for Bank One, and Dimon assuming the CEO position.  Instead, in furtherance of his own personal interests, Harrison, to keep his CEO title, caused JPMC shareholders to fund a multi-billion-dollar premium for Bank One and receive a smaller share of the combined Company.

150.   Similarly, Dimon also concealed the *quid pro quo* at the conference call.

151.   After the Merger was announced, Harrison retreated and appears to occupy himself visiting foreign countries and meeting with such dignitaries as former Secretaries of State Henry A. Kissinger and George P. Shultz.  By contrast, Dimon managed the operations of the combined Company.  Thus, even though Harrison ceded billions of dollars of value belonging to JPMC shareholders to retain his CEO title for

another two years, in many respects Dimon functioned as the de facto CEO of the combined entity immediately after the Merger was announced.

152.    In addition to his financial reasons, Harrison kept the CEO title to shape a graceful exit for himself.  In a February 23, 2004 CNBC interview, Harrison conceded: "I think the odds are that this is my last deal…."

**The False and Misleading Proxy/Prospectus Violates Federal Securities Laws**

153.    JPMC shareholders were repeatedly encouraged to review the Proxy/Prospectus sent to JPMC shareholders on or about April 21, 2004 in connection with the Merger.  For instance, the press release accompanying the announcement of the Merger stated: "Stockholders are urged to read the joint proxy statement/prospectus regarding the proposed transaction when it becomes available, because it will contain important information."

154.    However, the Proxy/Prospectus made no mention at all of Harrison's rejection of the opportunity to merge Bank One into JMPC without any acquisition premium.

155.    JPMSI, as the Company's investment banker, participated in the creation of the Proxy/Prospectus, including but not limited to the valuation analysis and the fairness opinion included therein.

156.    Although the Proxy/Prospectus represents that the JPMC Directors were regularly kept apprised of the negotiations, not once does the Proxy/Prospectus advise shareholders that a zero-premium merger of equals was offered but rejected solely because Harrison wanted to keep his CEO title.  The Proxy/Prospectus described the

negotiation process in great detail but carefully omitted any reference to the rejected

opportunity or any other aspect of the entrenchment scheme:

> William B. Harrison, Jr., Chairman and Chief Executive Officer of JPMorgan Chase, and James Dimon, Chairman and Chief Executive Officer of Bank One, have known each other for many years. From time to time they have had informal discussions about their respective institutions and trends in the financial services industry, including the increasing need for scale and diverse revenue bases.

> During November 2003, Mr. Harrison and Mr. Dimon had several discussions concerning the possibility of more seriously considering the merits of a business combination between JPMorgan Chase and Bank One. During these conversations, Messrs. Harrison and Dimon preliminarily discussed the possible structure of such a transaction. Based on these discussions, Messrs. Harrison and Dimon concluded that a transaction between the two companies could offer strategic benefits to the companies and their stockholders and that further discussions could be productive. Mr. Dimon and Mr. Harrison periodically updated members of their respective boards of directors about these contacts. At a meeting of the JPMorgan Chase board of directors on November 18, 2003, Mr. Harrison briefed the board on his discussions with Mr. Dimon and was authorized to continue discussions regarding a possible business combination with Bank One. Mr. Dimon, based on his conversations with members of the Bank One board of directors, likewise was encouraged to continue discussions regarding a possible business combination with JPMorgan Chase. In November 2003, each party retained legal and financial advisors in the event that discussions about a possible transaction progressed further.

> Discussions between Messrs. Harrison and Dimon continued in late November and into December. In addition, in December meetings commenced between the parties' respective financial advisers. During these discussions, the parties began considering in more detail the potential financial and other terms and conditions of such a transaction, and concluded that the contemplated merger would be for stock consideration based on a fixed exchange ratio. The parties also began exchanging information regarding each company's businesses, structure and management teams. Each of Mr. Harrison and Mr. Dimon continued to brief members of their respective boards of directors in early and mid-December and updated their respective boards regarding the status of discussions at board meetings in mid-December. At these meetings, the boards endorsed continued discussions.

> The chief financial officers of each company met in late December 2003 to hold additional discussions regarding a possible business

combination. In connection with the ongoing discussions, Bank One and JPMorgan Chase entered into a confidentiality agreement on December 23, 2003. Messrs. Dimon and Harrison also continued to discuss the possible key terms of a transaction, including possible financial terms and a framework for the combined company's board of directors and senior management.

In early January 2004, senior management of JPMorgan Chase and Bank One authorized their respective legal and financial advisors to discuss possible timeframes for a transaction and arrangements to facilitate broader mutual due diligence and negotiations between the parties regarding a possible transaction.

The parties and their legal and financial advisors met in New York City beginning on January 8, 2004, to undertake mutual confidential due diligence and management discussions and to organize a broader series of due diligence sessions, while counsel for the parties commenced discussions regarding the legal documentation for the transaction. Due diligence continued over the course of the next several days as the parties and their counsel continued to negotiate the terms of the definitive merger agreement and other related agreements, as well as terms of post-closing employment arrangements with Mr. Dimon and with several other key Bank One executives.

A special meeting of the board of directors of JPMorgan Chase was held on January 11, 2004, and special meetings of the board of directors of Bank One were held on both January 8 and 12, 2004. At these special meetings, the board of each company and their respective senior management and legal counsel reviewed and discussed strategic considerations relating to the transaction, the status of discussions regarding the terms of the proposed merger and governance arrangements and the status of each company's due diligence review of the other. In addition, each company's financial advisors presented financial information to their respective boards regarding the potential transaction. Following the completion of these meetings, negotiations between the parties and their respective counsel continued, and the parties continued their reviews of information obtained during due diligence. At a special meeting of the Bank One compensation committee on January 13, 2004, members of the committee reviewed the terms of the proposed employment agreement with Mr. Dimon and proposed severance and other senior management arrangements described under "— Interests of Directors and Executive Officers in the Merger" below. Mr. Dimon and members of senior management of Bank One discussed various aspects of the proposed transaction with individual members of the Bank One board of directors on January 13, 2004.

During the morning of Wednesday, January 14, 2004, the JPMorgan Chase board of directors held a special meeting to consider the proposed transaction, which was also attended by members of JPMorgan Chase's senior management and JPMorgan Chase's financial and legal advisors. At this meeting, JPMorgan Chase's senior management reviewed with the board of directors strategic considerations relating to the transaction and the progress of the negotiations regarding the terms of the transaction and apprised the board of the results of its due diligence review of Bank One. In addition, JPMorgan Chase's legal advisors discussed with the board of directors the legal standards applicable to its decisions with respect to the proposed transaction, reviewed the legal terms of the proposed definitive merger agreement and stock option agreements, and responded to questions from directors. JPMorgan Chase's Director of Human Resources also summarized for the board the terms of the proposed employment agreement with Mr. Dimon and the proposed severance and other senior management arrangements described under "— Interests of Directors and Executive Officers in the Merger" below. JPMorgan Chase's financial advisor, JPMorgan Securities, presented a summary of its financial analyses relating to the proposed merger, responded to questions posed by directors and, at the conclusion of its presentation, noted that it would be prepared to deliver its opinion that the proposed exchange ratio in the merger was fair to JPMorgan Chase from a financial point of view. During the January 11 and January 14 meetings, the JPMorgan Chase board discussed the proposed transaction and related agreements and asked questions of JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors. At the conclusion of the various presentations on January 14 and after further discussion, the directors determined to adjourn the meeting in order to provide management and JPMorgan Chase's legal advisors with the opportunity to finalize details of the merger agreement and related matters with Bank One and to reconvene later that day to formally consider approval of the merger agreement.

…

In the late afternoon of January 14, 2004, the JPMorgan Chase board of directors, with one director absent, reconvened its meeting. JPMorgan Chase's senior management and JPMorgan Chase's legal and financial advisors provided updates regarding the final terms of the proposed merger agreement and related agreements. JPMorgan Securities delivered its opinion that, as of that date and based on and subject to the considerations in its opinion, the exchange ratio in the merger was fair, from a financial point of view, to JPMorgan Chase. Following deliberations, the JPMorgan Chase board of directors, by unanimous vote of all directors present, and having been advised that the absent director concurred in the decision, approved the merger agreement and the related agreements and the transactions contemplated by those agreements, and

resolved to recommend that its stockholders vote to adopt the merger agreement.

Shortly following approval of each board of directors, the parties executed the merger agreement and related agreements. The parties announced the transaction via a joint press release issued in the early evening of January 14, 2004.

157.    The Proxy/Prospectus advised shareholders that the JPMC Board "determined that the merger agreement and related agreements are advisable and in the best interests of JPMorgan Chase and its stockholders and unanimously recommends that the JPMorgan Chase stockholders vote FOR the adoption of the merger agreement."

158.    The Proxy/Prospectus also included a fairness opinion authored and endorsed by JPMSI to the JPMC Directors which stated, in relevant part, "it is our opinion as of the date hereof that the Exchange Ratio in the proposed Merger is fair, from a financial point of view, to the Company." Although the Proxy/Prospectus advised that "Holders of [JPMC] common stock are urged to, and should, read this opinion carefully and in its entirety," JPMSI's fairness opinion omitted any analysis of the premium itself.

159.    As investors ultimately learned, and as detailed herein, the statements made in the Proxy/Prospectus issued in connection with the Merger were incomplete and materially misleading (and were known by JPMSI to be misleading at that time, or were recklessly disregarded thereby as such, for the reasons stated herein). At no time during the solicitation of votes from JPMC shareholders was the *quid pro quo* between Dimon and Harrion ever disclosed. Also not disclosed was that Dimon was willing to merge Bank One into JPMC without requiring an exchange ratio providing a premium.

160.    The omissions in the Proxy/Prospectus were designed to mislead shareholders of JPMC into approving the Merger (and the amendment to JPMC's certificate of incorporation to expand the corporate authorization to issue shares, without

which the Merger could not have been consummated) without knowing that Harrison had

passed on a nil-premium exchange ratio solely to preserve his CEO title, which he

considered to be in danger.  These statements also materially misled investors as to the

true rationale for the Merger and, as such, also operated as a fraud and deceit as to

investors who sold shares of the Company at any time during the Class Period.

161.    On May 25, 2004, in justifiable reliance on the materially deceptive

Proxy/Prospectus and having been kept in the dark about the full truth concerning the

terms of the deal, JPMC shareholders approved the Merger.  According to a Dow Jones

Newswire report on the shareholder meeting:

> While the merger was approved, *some shareholders did express concern that the $58 billion price tag associated with the deal is hefty.*
>
> One shareholder objected to the merger bid, saying that *Bank One will get the sweeter deal*, even though its earnings power was 6% less than J.P. Morgan's in the last quarter. Bank One will obtain J.P. Morgan's investment-banking expertise, its international capability and half of the company's board of directors, he said. And given the fact that Bank One's Chief Executive James Dimon will take on the role of J.P. Morgan's top officer two years from the conclusion of the merger, the shareholder said, *"It appears as if we're merging into them."*
>
> *The statement was met with loud applause from the shareholders who attended the meeting.* [Emphasis added.]

162.    According to a June 3, 2004 article by David Weidner of *CBS*

*MarketWatch* entitled "Bank One's Dimon may get early start atop J.P. Morgan":

> The support for an *immediate Dimon regime* became palpable when J.P. Morgan shareholders met last month to approve the deal. The agreement passed with 99 percent approval, but one shareholder complained that Bank One was getting the better deal -- J.P. Morgan is more profitable and Dimon is taking over.
>
> The shareholders remarks were met with a huge ovation, according to reports of the meeting.

"Historically, I don't know if the market's been that happy with J.P. Morgan or the old Chase's management," said James Mitchell, an analyst with Buckingham Research. "Dimon is seen as a savior for the franchise while Harrison has been hands off."

163.    On May 25, 2004, JPMC released the results of the shareholder vote at the annual meeting. The Merger was approved by 68 percent of the votes outstanding.

164.    Among the shareholder proposals put to a vote at the JPMC annual meeting, the proposal that received by far the most support was one recommending that JPMC's Board adopt a resolution requiring the separation of the Chairman and CEO posts. There were 562.5 million votes cast in favor of this proposal, confirming the extraordinary desire of JPMC shareholders to separate the Chairman and CEO posts. The seven other shareholder proposals put to a vote received between 55.1 million votes and 202.6 million votes. Had Harrison accepted Dimon's nil-premium exchange ratio offer, the Chairman and CEO posts would have been separated, with Harrison occupying the Chairman post and Dimon serving as CEO. However, Harrison concealed this opportunity from JPMC shareholders.

165.    With 2,081,783,154 shares entitled to vote at the annual meeting, at least 1,040,891,578 votes had to be cast in favor of the Merger for it to be approved and JPMC's certificate of incorporation amended to reflect the corporate authority necessary to issue enough shares in connection with the Merger. The threshold was exceeded by 374,785,482 votes, but 562,557,770 votes were cast in favor of the shareholder proposal to separate the Chairman and CEO posts.

166.    On July 1, 2004, JPMC completed the Merger.

167.    Statements contained in the Proxy/Prospectus were each materially false and misleading when made, as they misrepresented and/or omitted the following adverse

facts which then existed, the disclosure of which was necessary to make the statements made not false and/or misleading, including:

a.      When the Merger was negotiated and then recommended to JPMC's shareholders, JPMC's Board did not intend for Harrison to be the true CEO of the combined Company, such that it was false and materially misleading to pretend that this was the intention of Bank One and JPMC prior to the effective time of the Merger, or of JPMC following the effective time of the Merger;

b.      When the Merger was negotiated, Harrison rejected the opportunity to merge Bank One into JPMC with a nil-premium exchange ratio;

c.      When the Merger was negotiated and recommended, Harrison rejected the opportunity to merge Bank One into JPMC with a nil-premium exchange ratio because Dimon sought to be the CEO of the combined Company;

d.      A majority of JPMC's Board was not independent as a result of undisclosed financial relationships between certain of the JPMC Directors and the Company and personal relationships between certain of the JPMC Directors and Harrison;

e.      As a result of the undisclosed *quid pro quo* between Harrison and Dimon, JPMC shareholders were also materially misled as to the true structure and rationale of the Merger; and

f.      Harrison and Dimon were motivated to conceal the undisclosed backroom deal and made such materially false and misleading statements in the Proxy/Prospectus because this allowed Harrison to preserve his CEO title and allowed

- 54 -

Dimon to acquire dominance over the combined Company while securing for himself and other Bank One shareholders a premium to the detriment of JPMC shareholders.

168.    At all relevant times, JPMSI was acting as an agent of the Company and at the behest of Harrison with respect to the matters here at issue, among other things, pursuant to authority granted by the Board.

## SCIENTER ALLEGATIONS

169.    JPMSI knowingly, deliberately and/or recklessly participated in the foregoing scheme and committed the foregoing acts and practices, and/or possessed the motive and opportunity to do so, for the following reasons, among others.

170.    In the mergers and acquisitions ("M&A") industry, Wall Street's financial and legal advisors are always eager to participate in large combinations, not only for the lucrative fees involved, but also for credit in the "league tables," the Wall Street rankings for investment banks and law firms, a key factor in winning new business. "For years, banks have used the rankings by deal size as a marketing tool to try to convince customers to hire them." Caroline Humer, "M&A Industry Weighs Fees Against Size," *Reuters* (Dec. 5, 2004). "'Rankings matter,' said Haresh Sapra, an assistant professor of accounting at the University of Chicago's Graduate School of Management. 'You get to be No. 1 or No. 2 by working on a lot of deals. That gives clients confidence that you know how to close deals.'" Dan Lonkevich, "Morgan Stanley Catches Goldman in M&A With Lower Fees," *Bloomberg* (Jun. 14, 2004). "'All bankers pitch you about where they stand' in league tables to promote their ability to close deals, [Kroll Inc. CEO Michael] Cherkasky said." *Ibid.*

171.    As the largest deal in 2004, and one of the largest mergers in history, the Merger stood apart from other transactions by virtue of its sheer immensity. Any investment bank or law firm with a role in the Merger would be instantly catapulted to the top of the M&A rankings. Accordingly, any firm seeking to claim credit for playing a role in connection with the Merger would not willingly jeopardize its role and endanger its rankings by taking any action which would "rock the boat."

172.    By all accounts, JPMSI was a laggard in the M&A league tables. In JPMC's selection of its own investment bank subsidiary, JPMSI, as its financial advisor in the Merger, several observers saw a crafty maneuver to dramatically enhance the firm's league table rankings. In the scramble for market share, JPMSI, in one fell swoop, launched itself into a top spot in the league tables. According to the Thomson Financial M&A standard league tables for 2004, JPMSI took the top spot in the "US Announced Financial Advisors" category, with 32.5% market share and $271 billion of announced transactions.

173.    "Goldman Sachs remained the undisputed market leader both worldwide and in Europe in 2004. JP Morgan and Morgan Stanley followed in second and third place respectively. … In the US, however, Goldman Sachs was knocked off the top spot by JP Morgan Chase, mainly because JPM operated as its own consultant in the $ 57 billion merger with Bank One." Karl-Heinz Goedeckemeyer, "An uncertain year," *Die Bank* (Apr. 2005). "Critics are…raising their eyebrows over the year's biggest deal, J.P. Morgan Chase & Co.'s (JPM) $58 billion acquisition of Bank One. The issue? The adviser was J.P. Morgan's own team of bankers." Caroline Humer, "M&A Industry

Weighs Fees Against Size," *Reuters* (Dec. 5, 2004). The Merger amounted to 12% of the $481 billion reported aggregate volume of deals on which JPMSI advised.

174. JPMSI took second place in data provider Dealogic's 2004 "Global M&A Ranking," having earned $959 million in investment banking fees. However, had JPMSI not received the $40 million advisory fee in connection with the Merger, Morgan Stanley (with $941 million in fees) would have taken the second spot in the Dealogic "Global M&A Ranking." Indeed, had JPMSI received a $20 million fee (the same amount that Lazard was paid), Morgan Stanley would have overtaken JPMSI in Dealogic's 2004 "Global M&A Ranking."

175. The magnitude of JPMSI's fee is suspiciously out of line in comparison to fees paid in a similar-sized transaction. For instance: "Morgan Stanley earned $25 million for advising FleetBoston Financial Corp. on its $48 billion sale to Charlotte, North Carolina-based Bank of America Corp. Bank of America also paid Goldman $25 million." Dan Lonkevich, "Morgan Stanley Catches Goldman in M&A With Lower Fees," *Bloomberg* (Jun. 14, 2004).

176. The Delaware Court of Chancery has specifically questioned fees for financial advisors similar to the Merger fee awarded to JPMSI: "[T]he contingent compensation of the financial advisor…of roughly $40 million creates a serious issue of material fact, as to whether [the financial advisor]…could provide independent advice to the Special Committee." *In re Tele-Communications, Inc. S'holders Litig.*, Consol. C.A. No. 16470, slip op. at 29 (Del. Ch. Dec. 21, 2005) (Chandler, C.).

177. As alleged hereinabove, in addition to JPMSI's admitted conflict of interest, the extraordinary magnitude of the Merger, and the inflated fees awarded in

connection therewith, motivated JPMSI to participate in and facilitate Harrison's entrenchment scheme.

178.    JPMSI has no CEO, according to its registration filing with the SEC.  The CEO of JPMC is, in fact, the CEO of JPMSI.

179.    As Harrison controlled and ultimately headed JPMSI at all relevant times, his scienter, as alleged herein, is imputed to JPMSI.

180.    Immediately after the Merger was announced, Dimon enjoyed full decision-making authority within JPMC and, therefore, over JPMSI.  For instance, as reported in the March 23, 2006 article "In This Corner! The Contender" in *FORTUNE* magazine:

> On a Saturday in mid-February 2004, a month after the [Merger] was announced, Dimon brought together the top IT people [in JPMC].  He dazzled them with his grasp of protocols and software costs, then told the managers to choose a single platform in any area where multiple systems were in place.  "If you don't do it in six weeks," he warned, "I'll make all the choices myself."

181.    Insofar as Dimon controlled JPMC (and, therefore, JPMSI), his scienter, as alleged herein, is also imputed to JPMSI.

## LOSS CAUSATION

182.    Pre-Merger JPMC shareholders were lulled into inaction by the entrenchment scheme foisted upon them by Harrison, JPMSI and others.  Thus, JPMC shareholders were deprived of the opportunity to press for a zero premium combination as well as the opportunity to object to, or vote down, the Merger as proposed.

183.    The enormous acquisition premium paid for Bank One was a betrayal of the interests of JPMC shareholders.  The Merger exchange ratio (1.32 shares of JPMC for each share of Bank One) represented an acquisition premium of billions of dollars, at the

expense of JPMC's shareholders, based only on Harrison's desire to retain his CEO title for another two years even though under his leadership JPMC's stock price has fallen significantly and JPMC's reputation has suffered.

184.    The rejection of Dimon's offer to merge JPMC and Bank One without any acquisition premium cost JPMC shareholders over billions of dollars of value and substantially harmed the allocation of their stake in the new, combined Company merely so Harrison could remain CEO.

185.    But for the entrenchment scheme described herein, sellers of JPMC stock would have sold their stock at a significantly higher price.  The highly efficient markets for JPMC and Bank One securities promptly incorporated the misleading information set forth in the Press Release and reflected the market's assessment of the Merger.  After the announcement of the Merger, the combined market capitalization of JPMC and Bank One reflected the market's assessment of the combined Company's value.

186.    Based on the market reaction in the wake of the Merger announcement, the price per share of JPMC common stock would have increased by several dollars had a 1.153 Merger exchange ratio been agreed to and announced instead of 1.32.  As a result of the foregoing conduct, members of the Class were fraudulently deprived of the opportunity to sell or otherwise dispose of their JPMC securities at the higher price.

187.    Pre-Merger JPMC shareholders would not have voted in favor of the Merger had they known that JPMSI's fairness opinion was misleading.

188.    Pre-Merger JPMC shareholders would not have voted in favor of the Merger had they known that Dimon was willing to merge Bank One into JPMC with no acquisition premium if Harrison would relinquish his CEO title immediately.  In light of

their concerns about the hefty amount being paid to merge with Bank One, that information was plainly critical to JPMC shareholders. JPMSI concealed the information to prevent JPMC shareholders from discovering it and remained silent in the face of a duty to speak.

189.    Plaintiff and other members of the Class have been damaged in that, because of Defendant's wrongdoing, they received a depressed value for shares they sold or otherwise disposed of because the unfair exchange ratio, as announced on January 14, 2004, did not entitle them to receive their fair share of the value of the assets and business of the combined Company.

190.    Plaintiff and other members of the Class have also been damaged in that they suffered the unfair allocation of their individual holdings of JPMC stock, they were prevented from benefiting from a value-maximizing transaction, and many of them were required to vote on the Merger without having been advised of critical facts.

191.    As a result of the unfair exchange ratio, pre-Merger JPMC shareholders, including Plaintiff and other members of the Class, were allocated approximately 58 percent of the combined entity. If JPMC had merged with Bank One without paying any acquisition premium, as was proposed, pre-Merger JPMC shareholders, including Plaintiff and other members of the Class, would have held approximately 61 percent of the combined entity.

192.    In connection with the Merger, JPMC shareholders were wrongfully induced to approve, based on the defective Proxy/Prospectus, the following amendment to JPMC's certificate of incorporation:

> Article Fourth of the Certificate of Incorporation of the
> Surviving Corporation shall be amended by: (i) deleting the

words "FOUR BILLION SEVEN HUNDRED MILLION"
in the first sentence thereof and inserting in its place the
words "NINE BILLION TWO HUNDRED MILLION",
and (ii) deleting the words "FOUR BILLION FIVE
HUNDRED MILLION" in the first sentence thereof and
inserting in its place the words "NINE BILLION".

193.    The Proxy/Prospectus described the necessity of this amendment as

follows:

> Because JPMorgan Chase does not currently have a
> sufficient number of authorized but unissued and
> unreserved shares to complete the merger and related
> transactions, the merger agreement also provides that, as
> part of the merger, JPMorgan Chase's certificate of
> incorporation will be amended to increase the authorized
> shares of its common stock from 4,500,000,000 to
> 9,000,000,000 and, as amended, will be the certificate of
> incorporation of the combined company. This amendment
> will not be effected unless the merger is approved by
> stockholders and completed.

194.    As a result of the misrepresentations and omissions of material facts set

forth herein, including Defendant's failure to disclose that Harrison rejected the

opportunity to merge Bank One into JPMC with a nil-premium exchange ratio, JPMC

shareholders voted in favor of amending the Company's certificate of incorporation to

allow the Company to issue far more shares than the Company would have needed to

issue had Harrison agreed to a nil-premium exchange ratio.  This overissuance artificially

depressed the price of JPMC's common stock.

195.    Pre-Merger JPMC shareholders were damaged by the lost opportunity to

merge with Bank One without any dilutive premium.

196.    The wrongfully-obtained shareholder approval of corporate authority

caused the unfair allocation of the equity of pre-Merger JPMC shareholders in the

combined Company.

**PLAINTIFF'S INVESTIGATION**

197.    Plaintiff's allegations set forth herein are based on a thorough investigation, conducted by and through counsel, of all reasonably-available sources of information, in order to obtain information necessary to plead plaintiff's claims, including:

a.    The review and analysis of public filings of JPMSI, JPMC and Bank One with the SEC, as well as documents disseminated to shareholders of JPMC and Bank One;

b.    The review and analysis of securities analysts' reports and investor advisory services concerning JPMC and Bank One, including without limitation the analyst and advisory reports cited herein;

c.    The review and analysis of JPMC and Bank One press releases and publicly disseminated statements made by JPMSI and others, including but not limited to documents filed with and available at the SEC's EDGAR database system;

d.    The review and analysis of reports concerning JPMSI, JPMC and Bank One that have appeared in the print and electronic media and computer databases, including without limitation the articles cited herein; and

e.    Interviews of relevant witnesses, including face-to-face and telephone conversations with Landon Thomas, Jr., the reporter for the *New York Times* who first broke the story that Harrison had turned down the no-premium deal opportunity.  Mr. Thomas has extensively followed and reported on JPMC for years.  For instance, he previously authored a comprehensive article on JPMC and Harrison entitled "The Two J.P. Morgans" in the October 7, 2002 issue of *New York Magazine* as well as

an article in the January 18, 2004 edition of the *New York Times* on Dimon and the

Merger entitled "Dimon's Bank Deal: Big, but Maybe Not His Last."

198.    In addition to the conversations between Plaintiff's counsel and Mr.

Thomas, relied upon for certain allegations made upon information and belief, as set forth

hereinabove, Plaintiff relies in part on the *New York Times* guidelines for granting

confidentiality to unidentified sources, dated February 25, 2004, set forth in full below:

> Readers of The New York Times demand to know as much
> as possible about where we obtain our information and why
> it merits their trust. For that reason, we have long observed
> the principle of identifying our sources by name and title
> or, when that is not possible, explaining why we consider
> them authoritative, why they are speaking to us and why
> they have demanded confidentiality. Guidance on limiting
> the use of unidentified sources, and on informative
> description of those we do use, has appeared in several
> editions of our stylebook, including the current one, and in
> our Integrity Statement, dating from 1999.

> In the last few months, readers and our professional
> colleagues have asked for additional assurances — that we
> heed our own guidelines uniformly and that we are
> accountable for compliance. This restatement of our
> sourcing policy adds those elements. The rules are effective
> on March 1, 2004, and will become part of a revised
> Integrity Statement to be issued in the coming months.

> **Principles for Granting Anonymity**

> The use of unidentified sources is reserved for situations in
> which the newspaper could not otherwise print information
> it considers reliable and newsworthy. When we use such
> sources, we accept an obligation not only to convince a
> reader of their reliability but also to convey what we can
> learn of their motivation — as much as we can supply to let
> a reader know whether the sources have a clear point of
> view on the issue under discussion.

> In routine interviewing — that is, most of the interviewing
> we do — anonymity must not be automatic or an assumed
> condition. In that kind of reporting, anonymity should not
> be <u>offered</u> to a source. Exceptions will occur in the

reporting of highly sensitive stories, when it is we who have sought out a source who may face legal jeopardy or loss of livelihood for speaking with us. Similarly they will occur in approaches to authoritative officials in government who, as a matter of policy, do not speak for attribution. On those occasions, we may use an offer of anonymity as a wedge to make telephone contact, get an interview or learn a fact. In such a case, the reporter should press the source, after the conversation, to go on the record with the newsworthy information that has emerged.

Whenever anonymity is granted, it should be the subject of energetic negotiation to arrive at phrasing that will tell the reader as much as possible about the <u>placement and motivation</u> of the source — in particular, whether the source has firsthand knowledge of the facts.

In any situation when we cite anonymous sources, at least some readers may suspect that the newspaper is being used to convey tainted information or special pleading. If the impetus for anonymity has originated with the source, further reporting is essential to satisfy the reporter and the reader that the paper has sought the whole story.

We will not use anonymous sourcing when sources we can name are readily available.

Confidential sources must have direct knowledge of the information they are giving us — or they must be the authorized representatives of an authority, known to us, who has such knowledge.

We do not grant anonymity to people who are engaged in speculation, unless the very act of speculating is newsworthy and can be clearly labeled for what it is.

We do not grant anonymity to people who use it as cover for a personal or partisan attack. If pejorative opinions are worth reporting and cannot be specifically attributed, they may be paraphrased or described after thorough discussion between writer and editor. The vivid language of direct quotation confers an unfair advantage on a speaker or writer who hides behind the newspaper, and turns of phrase are valueless to a reader who cannot assess the source.

Anonymity should not be invoked for a trivial comment, or to make an unremarkable comment appear portentous.

We do not promise sources that we will refrain from additional reporting or efforts to verify the information being reported.

We do not promise sources that we will refrain from seeking comment from others on the subject of the story. (We may, however, agree to a limited delay in further inquiries — until the close of stock trading, for example.)

**Responsibilities of Editors**

When anonymity is granted, reporter and source must understand that the commitment is undertaken by the newspaper, not alone by an individual journalist. Any editor who learns a source's identity is required to maintain exactly the same confidentiality as the reporter. That editor may not divulge the identity to other reporters, or to unauthorized editors. And the editor may not use the source — either for reporting on the current story or for later ones.

In the case of a routine story with unidentified sourcing, the name or explicit role of the source should be conveyed confidentially to the reporter's department head. At the discretion of the department head — and provided the reporter agrees — the responsibility for learning about the source may be delegated to a subordinate supervising editor. (Departments are expected to formulate their own day-to-day routines, in consultation with reporters, for expeditious handling of source information.) In all such routine cases, the department head is accountable for knowing the identity of the source, or for knowing which subordinate editor has been informed. Upon request, the executive editor and the managing editors are entitled to know the identity of the source.

In the case of a moderately sensitive story, the reporter may wish to share the identity with the executive editor or managing editor only. Such a request should be honored without prejudice, and not taken to signify a lack of trust.

In the case of exceptionally sensitive reporting, on crucial issues of law or national security in which sources face dire consequences if exposed, the reporter may appeal to the executive editor for total confidentiality. In such circumstances, intended to be extremely rare, the executive

editor may choose to ask for only a limited description of the source and waive the right to know the full identity. Only the executive editor may approve such a request.

The standards editor, while not necessarily entitled to know the identity of a confidential source, is responsible for spot-checking compliance with our procedures — that is, for knowing which editors have learned the identity.

**Forms of Attribution to Confidential Sources**

When we agree to anonymity, the reporter's duty is to obtain terms that conceal as little as possible of what the reader needs to gauge reliability. We should distinguish conscientiously between high-level and lower-level executives or officials. We should not use blind attribution — *"sources said,"* for example — which is more a tease than a signpost. Attribution should never amount to a truism: since *"source"* merely means a provider of information, *"one source said"* is equivalent to *"somebody said."* And *"informed"* or *"reliable source"* is no improvement. (Would The Times quote an uninformed or unreliable one?) The objection is not to the word *"source,"* but to its emptiness without a meaningful modifier: *"a Senate source,"* for example, may be acceptable — unless, of course, it is possible to tell the reader still more. The word *"official"* is overused, and cries out for greater specificity.

Trail markers should be as detailed as possible. *"United States diplomat"* is better than *"Western diplomat,"* which is better than *"diplomat."* Still better is *"a United States diplomat who took part in the meeting."* And *"a lawyer who has read the brief"* or *"an executive close to the XYZ Company"* is far better than *"a person familiar with the case,"* a phrase so vague that it could even mean the reporter.

Readers value signs of candor: *"The report was provided by a Senate staff member working to defeat the bill."*

Whenever possible, in writing about documents we should specify how we received them.

We should avoid automatic references to sources who "insisted on anonymity" or "demanded anonymity"; rote phrases offer the reader no help and make our decisions

appear automatic. When possible, though, articles should
tersely explain what kind of understanding was actually
reached by reporter and source, and should shed light on
the reasons and the source's motives.

In editing on the copy desk or at higher levels, the
description of a source must never be altered without
consultation with the reporter who made the confidentiality
commitment.

It should go without saying that The Times is truthful. We
do not dissemble about our sources — we do not, for
example, refer to a single person as "sources" and do not
say "other officials" when quoting someone who has
already been cited by name. We do not say a source has
refused to comment if in fact that person has commented
off the record. (We may, however, say — when it is true —
that the source refused to comment on a specific aspect of
the story.) There can be no prescribed formula for
attribution, but it must be literally truthful, and not coy.

**Multiple Anonymous Sources**

When we grant anonymity, we do not necessarily require
multiple sources. A cabinet official, for example, or the
White House adviser on national security, may require
anonymity while conveying a policy decision that is clearly
"authorized," necessitating no corroborating source.

But when we grant anonymity for less verifiable assertions
— especially if they form a disputed account, or are
potentially damaging to one side in a court case, for
example — corroborating sources are often necessary. The
reporter should confer with the department head or senior
deputy to agree upon the need and the number.

In such a case, the reporter and editor must be satisfied that
the sources are genuinely independent of one another, not
connected behind the scenes in any kind of "echo chamber"
that negates the value of a cross-check.  [All emphasis in
original.]

199. Except as alleged herein, due to the extraordinary measures undertaken to

ensure the secrecy of the Merger negotiations, the underlying information relating to

Defendant's misconduct and the particulars thereof are not available to Plaintiff and the

public, and lie exclusively within the possession and control of Defendant, its agents, and others close to the Merger negotiations, thus preventing Plaintiff from further detailing Defendant's misconduct.

## NO SAFE HARBOR

200.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint because the specific statements pleaded herein either were not identified as "forward-looking statements" when made or were unaccompanied by meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the specific statements.  To the extent that the statutory safe harbor applies to any of the statements pleaded herein, Defendant is liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker knew or had reason to know that the particular forward-looking statement was false, and/or the forward-looking statement was made by or with the approval of an executive officer of JPMC or Bank One who knew or had reason to know that the statement was false or misleading.

## COUNT I

### AGAINST JPMSI FOR VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 THEREUNDER

201.    Paragraphs 1 through 200 are hereby realleged and incorporated herein by reference.

202.    This count is brought against JPMSI pursuant to Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5], on behalf of the members of the Class.

203.    JPMSI knowingly or recklessly violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that it: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices and a course of conduct that operated as a fraud or deceit upon the members of the JPMC Seller Class in connection with their sales or disposition of JPMC securities.

204.    JPMSI participated in and joined the alleged scheme and course of conduct specified above, including the Merger negotiations and creation of the Merger agreement, Press Release and Proxy/Prospectus, and is liable primarily for the aforesaid wrongful acts and statements specified above.

205.    In ignorance of the false and misleading nature of the representations and omissions described above, members of the Class relied, to their detriment, directly on the misrepresentations and omissions or on the integrity of the market both as to price and as to whether to sell or otherwise dispose of the securities.  The highly efficient markets for JPMC and Bank One securities promptly incorporated the misleading information set forth in the Press Release and reflected the market's assessment of the Merger.

206.    As alleged herein, Defendant caused the losses suffered by Plaintiff and other members of the Class.

207.    By virtue of the foregoing, JPMSI violated Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

## COUNT II

## AGAINST JPMSI FOR
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

208.    Paragraphs 1 through 200 are hereby realleged and incorporated herein by reference.

209.    At all times herein, the directors and officers of JPMC owed fiduciary duties of loyalty and disclosure to Plaintiff and other members of the Class.

210.    Through the entrenchment scheme, Harrison and the other JPMC Directors breached their fiduciary duties to Plaintiff and other members of the Class.

211.    Defendant possessed actual or constructive knowledge that Harrison and his fellow JPMC directors were breaching their fiduciary duties, but nonetheless participated in perpetrating the entrenchment scheme alleged herein.

212.    Defendant's actions, as described in this complaint, were a substantial factor in causing the losses suffered by Plaintiff and other members of the Class.  By participating in the breach of fiduciary duty by Harrison and his fellow JPMC directors, Defendant is liable therefore.

213.    Accordingly, Defendant's knowing participation in the breaches of fiduciary described herein resulted in billions of dollars of damages.

214.    Because Defendant acted with reckless and willful disregard for the rights of Plaintiff and other members of the Class, Defendant is liable for punitive damages in an amount to be determined by a jury.

## COUNT III

## AGAINST JPMSI FOR
## CIVIL CONSPIRACY

215.    Paragraphs 1 through 200 are hereby realleged and incorporated herein by reference.

216.    Beginning in or before December 2003, and continuing up to and including July 1, 2004, within the District of Delaware, and elsewhere, defendant JPMSI did knowingly conspire with others known and unknown to violate the Exchange Act.

217.    JPMSI's conspiracy to violate the Exchange Act also violated Delaware common law.

218.    In furtherance of said conspiracy and to effect and accomplish the objects thereof, defendant JPMSI and others known and unknown committed the following overt acts, among others, within the District of Delaware, and elsewhere: (1) disseminated false and misleading shareholder solicitations; (2) rendered and disseminated a misleading fairness opinion; and (3) concealed a superior merger opportunity from JPMC shareholders in written and oral communications.

219.    This conspiracy caused Plaintiff and the Class to lose a valuable opportunity.

## PRAYER FOR RELIEF

**WHEREFORE**, on behalf of themselves and the Class, Plaintiff demands judgment against Defendant as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying Plaintiff as a representative of the Class;

B.    Declaring and determining that the Defendant violated the federal securities laws and common law by reason of its conduct as alleged herein;

C.    Awarding the Class compensatory and punitive damages against Defendant in an amount to be determined at trial, together with pre-judgment and post judgment interest at the maximum rate allowable by law;

D.    Awarding Plaintiff his costs and disbursements, including the fees of Plaintiff's counsel and expert(s), and reimbursement of expenses; and

E.    Granting Plaintiff and the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

220.    Plaintiff hereby demands a trial by jury for all issues so triable.

DATED:        April 6, 2006            Respectfully submitted,

_____/s/_____
JOSEPH N. GIELATA (#4338)
Attorney at Law
501 Silverside Road, No. 90
Wilmington, Delaware 19809
(302) 798-1096

*Attorney for Plaintiff*

## CERTIFICATION OF SAMUEL I. HYLAND
## IN SUPPORT OF SECURITIES CLASS ACTION COMPLAINT

Samuel I. Hyland, for his certification, pursuant to 28 U.S.C. § 1746 and 15 U.S.C. § 78u-4, states as follows:

1.    I reside in New Castle County, Delaware.

2.    I have reviewed the facts and allegations of the complaint against J.P. Morgan Securities, Inc., which was investigated and prepared by counsel.

3.    I have authorized the filing of the aforesaid complaint.

4.    I have reviewed my records for transactions in the stock of JPMorgan Chase & Co. ("JPMC") for the time period January 15, 2004 through the present (the "Class Period").

5.    I held 300 shares of JPMC common stock at the opening of the Class Period. I sold all such shares during the Class Period.

6.    I intend to actively monitor the conduct of this action for the benefit of the class. I have retained Joseph N. Gielata, Esq. to prosecute this action and have agreed to reasonable terms of engagement, including the provision of a reasonable contingency fee in the event of any class-wide recovery. Mr. Gielata is knowledgeable and experienced in securities litigation and corporate governance litigation involving Delaware corporations. Mr. Gielata updates me regularly concerning developments in related litigation and I am satisfied that he will keep me in the loop with respect to material developments and decisions in this case.

7.    I believe that my claims against the defendant are typical of those of other members of the class.

8.     I did not purchase the securities that are the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

9.     I am willing to serve as a representative party on behalf of the class of JPMC shareholders, including providing testimony at depositions and trial. I intend to pursue this litigation for the best interests of all class members.

10.     I am the founder and manager of a private business, the Brandywine Cider Company, and received a Master's in Business Administration from Columbia University. I believe that my business experience and investment sophistication will better enable me to represent the class. I am comfortable and sufficiently experienced in dealing with attorneys and the judicial process.

11.     During the three-year period preceding the date of this Certification, I have sought to serve, and was duly appointed, as lead plaintiff in *Hyland v. Harrison*, Civ. A. No. 05-162-JJF (D. Del.) (commenced March 17, 2005).

12.     I will not accept any payment for serving as representative party on behalf of the class beyond my pro rata share of any recovery, except as ordered and approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: March 21 , 2006

SAMUEL I. HYLAND

⍟JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.    (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

Samuel I. Hyland

## DEFENDANTS

J.P. MORGAN SECURITIES, INC. a Delaware corporation

**(b)**  County of Residence of First Listed Plaintiff    New Castle
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Joseph N. Gielata, 501 Silverside Road, No. 90, Wilmington, Delaware 19809
(302) 798-1096

Attorneys (If Known)

## II.  BASIS OF JURISDICTION  (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☒ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V.  ORIGIN  (Place an "X" in One Box Only)

| | | | | | | Appeal to District |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment |

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity)**:
15 U.S.C. §§ 78j(b), 78n(a) and 78t(a), 17 C.F.R. §§ 240.l0b-5 and 240.14a-9,  15 U.S.C. §§ 77k, 77l(a)(2) and 77o

Brief description of cause:  Class action brought in connection with the defendants' breaches of fiduciary duty, issuance of materially false and misleading statements and failure to
disclose material facts regarding the merger of Bank One Corporation into JPMorgan Chase & Co.

## VII.  REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION**
UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes   ☐ No

## VIII.  RELATED CASE(S) IF ANY

(See instructions):

JUDGE    Joseph J. Farnan, Jr.  (D. Del.)
William J. Hibbler (N.D. Ill.)

DOCKET NUMBER  05-cv-162-JJF; 04-cv-6592-WJH

DATE    4-6-06

SIGNATURE OF ATTORNEY OF RECORD
/s/ Joseph N. Gielata

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. 0 6 - 2 2 4

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

FILED 2005 APR -6 AM 11:34 CLERK U.S. DISTRICT COURT DISTRICT OF DELAWARE

I HEREBY ACKNOWLEDGE RECEIPT OF _____ 2 _____ COPIES OF AO FORM 85.

_____4-6-06_____
(Date forms issued)

_____
(Signature of Party or their Representative)

Joseph Gielata
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action