**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SAMUEL I. HYLAND,<br>    individually and on behalf of all<br>        others similarly situated,<br><br>    *Plaintiff*,<br>                    v.<br><br>J.P. MORGAN SECURITIES, INC.,<br>    a Delaware corporation,<br><br>    *Defendant*. | Civil Action No. 06-224 JJF<br><br><br><br>**CLASS ACTION** |

**DECLARATION OF JOSEPH N. GIELATA IN SUPPORT OF
PLAINTIFF SAMUEL I. HYLAND'S MOTION TO
<u>MODIFY THE PSLRA'S STAY OF DISCOVERY</u>**

JOSEPH N. GIELATA, a member of the Bar of the Supreme Court of Delaware, for this declaration states:

1.      I represent Plaintiff Samuel I. Hyland in the above-captioned matter.

2.      I make this Declaration in support of Plaintiff Samuel I. Hyland's Motion To Modify The PSLRA's Stay Of Discovery.  I understand that discovery is presently underway in *Blau v. Harrison*, No. 04-6592 (N.D. Ill.).  I have received a copy of plaintiff's first requests for documents to defendants in *Blau*.

3.      Exhibit A to this Declaration is a true and correct copy of the February 14, 2005 press release issued by the New York Stock Exchange, entitled "NYSE Regulation Fines J.P. Morgan Securities $2.1 million," available at

http://www.nyse.com/press/1108381354571.html .

4.      Exhibit B to this Declaration is a true and correct copy of Securities and Exchange Commission Release No. 51200 (Feb. 14, 2005), available at http://www.sec.gov/litigation/admin/34-51200.htm .

5.      Exhibit C to this Declaration is a true and correct copy of the unreported decision in *Vacold LLC and Immunotherapy, Inc. v. Cerami*, 2001 WL 167704 (S.D.N.Y. Feb. 16, 2001).

6.      Exhibit D to this Declaration is a true and correct copy of the unreported decision and order in *Newby v. Enron*, No. H-01-3624 (S.D. Tex. Feb. 27, 2002).

7.      Exhibit E to this Declaration is a true and correct copy of the unreported decision in *In re Flir Systems, Inc. Sec. Litig.*, 2000 WL 33201904 (D. Or. 2000).

8.      Exhibit F to this Declaration is a true and correct copy of the unreported decision in *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 2002 WL 31845114 (S.D. Tex. Aug. 16, 2002).

9.      Exhibit G to this Declaration is a true and correct copy of the unreported decision and order in *In re BankAmerica Corp. Securities Litigation*, MDL No. 1264, Order (E.D. Mo. July 19, 1999).

10.     Exhibit H to this Declaration is a true and correct copy of the unreported decision in *In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. 02-MD-1335, 2003 WL 23830479 (D.N.H. Jan. 29, 2003).

The foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: June 22, 2006                    /s/ *Joseph N. Gielata*
                                        Joseph N. Gielata (# 4338)

## CERTIFICATE OF SERVICE

I hereby certify that, on June 22, 2006, I electronically filed the *DECLARATION OF JOSEPH N. GIELATA IN SUPPORT OF PLAINTIFF SAMUEL I. HYLAND'S MOTION TO MODIFY THE PSLRA'S STAY OF DISCOVERY* with the Clerk of Court using CM/ECF which will send notification of such filing to:

>Michael R. Robinson, Esq.
>**RICHARDS LAYTON & FINGER, P.A.**
>One Rodney Square
>Wilmington, DE  19801
>
>*Counsel for Defendant*

>  /s/ *Joseph N. Gielata*
>Joseph N. Gielata (# 4338)

# Exhibit A



**NYSE Regulation Fines J.P. Morgan Securities $2.1 million**

NEW YORK, February 14, 2005 – New York Stock Exchange Regulation announced today that it has taken a disciplinary action against **J.P. Morgan Securities, Inc. of New York City,** a member firm, for failing to preserve electronic mail communications (including inter-office memoranda and communications) received and sent by its employees that related to its business, as well as supervisory failures.   This matter arises out of the research analyst conflict of interest case.

An NYSE hearing panel found that, between July 1, 1999 and June 30, 2002, the firm failed to ensure compliance with certain NYSE rules and federal securities laws.  The firm consented without admitting or denying guilt.

- In addition, the hearing panel found the firm lacked adequate systems or procedures for the preservation of electronic mail communications.
- NYSE Regulation, the U.S. Securities and Exchange Commission and NASD Inc. discovered these deficiencies during a joint inquiry into the supervision of the firm's research and investment banking activities.

"J.P. Morgan Securities's representation that its email production was complete, without disclosing that it had failed to retain, locate and restore all email responsive to our investigation, is simply unacceptable," said Susan L. Merrill, chief of enforcement, NYSE Regulation.

The NYSE imposed a penalty of a censure, $2.1 million fine, and a requirement that the firm review its procedures regarding the preservation of electronic communications for compliance with Exchange rules and the federal securities laws.  J.P. Morgan Securities consented to the penalty.  The amount paid to the Exchange by the firm was reduced by $700,000 pursuant to a civil monetary penalty paid to the U.S. Treasury and by $700,000 pursuant to a fine paid to the NASD, in related proceedings.

## About NYSE Regulation

On December 17, 2003, the SEC approved a new governance structure for the NYSE.  Under the new design, the NYSE Board of Directors is comprised solely of independent directors, except for the chief executive officer, who have no affiliation with any regulated member firm.  A new position of chief regulatory officer was created and reports directly to the board of directors through a new Regulatory Oversight Committee.  As a result, NYSE Regulation is insulated from potential influence from NYSE members and member firms, operates separately from the business side and is independent in its decision-making.

NYSE Regulation plays a critical role in monitoring and regulating the activities of its members, member firms and listed companies, as well as enforcing compliance with NYSE rules and federal securities laws.  Nearly 400 of the largest securities firms in America are members of the New York Stock Exchange.  These firms service 92 million customer accounts, or 90 percent of the total public customer accounts handled by broker-dealers, with total assets of over $3 trillion.  They operate from 19,000 branch offices around the world and employ 146,000 registered personnel.  Nearly 700 employees, or more than 40 percent of the

Exchange's staff, work for NYSE Regulation, which consists of four divisions: Market Surveillance, Member Firm Regulation and Enforcement and Listed Company Compliance.

# # #

Contact: Scott Peterson
Phone: 212.656.4089
Email: speterson@nyse.com

Home | Previous Page

U.S. Securities and Exchange Commission

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE**
**COMMISSION**

# Exhibit B

**Securities Exchange Act of 1934**
**Release No. 51200 / February 14, 2005**

**Admin. Proc. File No. 3-11828**

| | |
|---|---|
| In the Matter of<br><br>J.P. Morgan Securities Inc.,<br><br>Respondent. | ORDER INSTITUTING PROCEEDINGS PURSUANT TO SECTION 15(b)(4) AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING CEASE-AND-DESIST ORDER, PENALTY, AND OTHER RELIEF |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative proceedings pursuant to Section 15(b)(4) and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), be and hereby are, instituted against *J.P. Morgan Securities Inc.* ("Respondent" or "JPMSI").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement ("Offer") to the Commission, which the Commission has determined to accept. Solely for the purpose of these proceedings, and any other proceedings brought by or on behalf of the Commission or to which the Commission is a party, Respondent, without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and over the subject matter of these proceedings, consents to the entry of this Order Instituting Proceedings Pursuant to Section 15(b)(4) and Section 21C of the Securities

Exchange Act of 1934, Making Findings, and
Imposing Cease-and-Desist Order, Penalty, and
Other Relief ("Order").

### III.

On the basis of this Order and Respondent's Offer,
the Commission finds that:

### A. RESPONDENT

J.P. Morgan Securities Inc. is a subsidiary of
JPMorgan Chase & Co. ("JPMC"), a Delaware
corporation with its principal place of business in
New York, New York. Respondent is a
broker-dealer registered with the Commission
pursuant to Section 15(b) of the Exchange Act and
is a member of the New York Stock Exchange, Inc.
("NYSE") and NASD, Inc. ("NASD") and engages in
a nationwide securities business. Respondent
provides equity research, sales, trading services,
merger and acquisition advisory services, private
banking services and underwriting services.

### B. SUMMARY

This action concerns Respondent's violations of the
record-keeping requirements of Section 17(a) of
the Exchange Act and Rule 17a-4 thereunder during
the period of July 1, 1999 to June 30, 2002 (the
"relevant period"). During all or part of the
relevant period, Respondent failed to preserve for
three years, the first two of which in an easily
accessible place, all electronic mail communications
(including inter-office memoranda and
communications) received and sent by its
employees that related to its business as a
member of an exchange, broker or dealer.
Respondent lacked adequate systems or
procedures for the preservation of electronic mail
communications. The Commission, NYSE, and
NASD (collectively, "the regulators") discovered
these deficiencies during an inquiry into the
supervision of Respondent's research and
investment banking activities.

### C. BACKGROUND

During the relevant period, Respondent and its
predecessor entities engaged in both research and
investment banking activities. In 1999, JPMSI was
a subsidiary of J.P. Morgan & Co. Incorporated
("JPM"), and Chase Securities Inc. ("CSI") was a
subsidiary of The Chase Manhattan Corporation

("Chase"). That year, Chase acquired Hambrecht & Quist LLC ("H&Q"), which engaged in research and investment banking activities. H&Q was merged into CSI, which operated under the name CSI and the trade name Chase H&Q until the merger of JPMSI and CSI.[1] In December 2000, Chase acquired JPM, creating JPMC. In May 2001, CSI and JPMSI merged and assumed the name *J.P. Morgan Securities Inc.*

For purposes of this Order, JPMSI and its predecessor entities that engaged in both research and investment banking activities - H&Q, CSI, and JPMSI - shall be referred to, collectively, individually, or in any combination, as "Respondent" or "JPMSI."

**D. FACTS**

In April 2002, the regulators commenced an inquiry into the research and investment banking activities of Respondent and other broker-dealers during the period of July 1, 1999 to June 30, 2001 (the "Phase I inquiry"). During this time, employees of Respondent used electronic communications to conduct business for the firm as a broker-dealer and member of an exchange.

Pursuant to the Phase I inquiry, the regulators made multiple requests to JPMSI for electronic mail ("e-mail") of research analysts and investment bankers. Respondent produced e-mail in response to these requests and subsequently indicated that e-mail production had been completed for certain individuals. The communications and other information contained in the e-mail provided evidence that, among other things, JPMSI had engaged in acts and practices that imposed conflicts of interest on research analysts.

In April 2003, the regulators initiated and settled enforcement actions against JPMSI and other broker-dealers for various violations involving their research and investment banking activities. *See SEC v. J.P. Morgan Securities Inc.*, 04 Civ. 2939 (S.D.N.Y. Apr. 28, 2003); *J.P. Morgan Securities Inc.*, Hearing Panel Decision 03-68 (Apr. 22, 2003); *J.P. Morgan Securities Inc.*, NASD Letter of Acceptance Waiver and Consent No. CAF 030019 (April 24, 2003).

In May 2003, the regulators focused their inquiry on the supervision of the research and investment

banking activities of Respondent and other broker-dealers during the period of July 1, 1999 to June 30, 2002 (the "Phase II inquiry"). The regulators requested that Respondent produce e-mail for various supervisory personnel and other employees. Respondent produced certain e-mail in response to these requests.

In August 2003, in response to requests by the regulators, Respondent indicated that e-mail productions for certain individuals were complete. Respondent stated that it had conducted a thorough review of internal logs to identify relevant "backup tapes" used to preserve e-mail responsive to the regulators' requests for information and that e-mail for certain individuals identified in the request had been produced.

In November 2003, the regulators requested that Respondent provide information regarding its ability to locate and restore backup tapes containing e-mail responsive to the regulators' requests during the investigation. Respondent subsequently advised the regulators that it had failed to retain or was unable to locate all responsive e-mail requested during those inquiries. Respondent's failure to retain all responsive e-mail was attributable to the following causes: certain backup tapes containing responsive e-mail could not be located in the storage facilities; certain backup tapes were damaged, contained data or media errors, or otherwise could not be restored; and Respondent failed to create or properly maintain backup tapes for certain time periods. Prior to November 2003, Respondent did not inform the regulators of its failure to retain responsive e-mail.

During the relevant period, Respondent had systems and procedures requiring the retention of certain electronic communications. However, those systems and procedures were inadequate to ensure that all electronic communications relating to Respondent's business were preserved for three years and for the first two years in an easily accessible place.

**E. LEGAL DISCUSSION**

Section 17(a)(1) of the Exchange Act provides that each member of a national securities exchange, broker, or dealer "shall make and keep for prescribed periods such records, furnish copies

thereof, and make and disseminate such reports as the Commission, by rule, prescribes as necessary or appropriate in the public interest, for the protection of investors, or otherwise in furtherance of the purposes of this title."

The Commission has emphasized the importance of the records required by the rules as "the basic source documents" of a broker-dealer. *Statement Regarding the Maintenance of Current Books and Records by Brokers and Dealers*, 4 SEC Docket 195 (April 26, 1974). The record-keeping rules are a "keystone of the surveillance of brokers and dealers by [Commission] staff and by the securities industry's self-regulatory bodies." *Edward J. Mawod & Co.*, 46 S.E.C. 865, 873 n. 39 (1977) (citation omitted), *aff'd sub nom. Mawod & Co. v. SEC*, 591 F.2d 588 (10th Cir. 1979).

Pursuant to its authority under Section 17(a)(1) of the Exchange Act, the Commission promulgated Rule 17a-4. Rule 17a-4(b)(4), in turn, requires Respondent to "preserve for a period of not less than three years, the first two years in an easily accessible place…. [o]riginals of all communications received and copies of all communications sent … by the member, broker or dealer (including inter-office memoranda and communications) relating to its business as such[.]" Rule 17a-4 is not by its terms limited to physical documents. The Commission has stated that internal electronic mail communications fall within the purview of Rule 17a-4 and that for the purposes of Rule 17a-4, "the content of the electronic communication is determinative" as to whether that communication is required to be retained and accessible. *In the Matter of Deutsche Bank Securities, Inc., et al.*, Rel. No. 34-46937 (Dec. 3, 2002) (*citing Reporting Requirements for Brokers or Dealers under the Securities Exchange Act of 1934*, Rel. No. 34-38245 (Feb. 5, 1997)); *see also In re Janney Montgomery Scott LLC*, Rel. No. 34-50252 (Aug. 25, 2004); *In the Matter of Robertson Stephens, Inc.*, Rel. No. 34-47144 (Jan. 9, 2003).

Based on the foregoing and Respondent's Offer of Settlement, the Commission finds that Respondent willfully violated Section 17(a) of the Exchange Act and Rule 17a-4 promulgated thereunder by failing to preserve electronic mail communications for three years, the first two of which in an easily accessible place.[2]

## IV.

## UNDERTAKINGS

A. Respondent undertakes and agrees to pay penalties and fines totaling $2.1 million to resolve this proceeding and related actions by NYSE and NASD. In addition to the $700,000 civil penalty Respondent shall pay to the U.S. Treasury pursuant to this Order, Respondent undertakes and agrees to pay fines in the amount of $700,000 to NYSE and $700,000 to NASD.

B. Respondent has undertaken to review its procedures regarding the preservation of electronic mail communications for compliance with the federal securities laws and regulations, and the rules of NYSE and NASD. Within 90 days of the issuance of this Order, unless otherwise extended by the staff of the Commission for good cause shown, Respondent undertakes and agrees to inform the Commission in writing that it has completed its review and that it has established systems and procedures reasonably designed to achieve compliance with those laws, regulations, and rules concerning the preservation of electronic mail communications.

## V.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions specified in Respondent's Offer.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

A. Respondent cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Exchange Act and Rule 17a-4 promulgated thereunder, pursuant to Section 21C of the Exchange Act;

B. Respondent is censured pursuant to Section 15(b)(4) of the Exchange Act;

C. Pursuant to Section 15(b)(4) and Section 21B of the Exchange Act, Respondent shall pay $700,000 to the U.S. Treasury as a civil penalty within ten (10) days after the entry of the Order. The payment shall be: (A) made by United States postal money order, certified check, bank cashier's check, or bank money order; (B) made payable to the Securities and Exchange Commission; (C)

hand-delivered or mailed to the Comptroller,
Securities and Exchange Commission, Operations
Center, 6432 General Green Way, Stop 0-3,
Alexandria, VA 22312; and (D) submitted under
cover of a letter that identifies the payor as
Respondent in these proceedings and the file
number of these proceedings. A copy of the cover
letter and money order or check shall be sent to
Antonia Chion, Associate Director, Division of
Enforcement, Securities and Exchange
Commission, 450 Fifth Street N.W., Washington,
D.C. 20549-0801; and

D. Respondent shall comply with the undertaking
contained in Section IV.B, above.

   By the Commission.

                Jonathan G. Katz
                Secretary

## Endnotes

[1] CSI did not publish equity research prior to
Chase's acquisition of H&Q.

[2] "Willfully" as used in this Order means
intentionally committing the act which constitutes
the violation. *See Wonsover v. SEC*, 205 F.3d 408,
414 (D.C. Cir. 2000); *Tager v. SEC*, 344 F.2d 5, 8
(2d Cir. 1965). There is no requirement that the
actor also be aware that he is violating one of the
Rules or Acts.

*http://www.sec.gov/litigation/admin/34-51200.htm*

# Exhibit C



▷

**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
VACOLD LLC and IMMUNOTHERAPY, INC.,
Plaintiffs,
v.
Anthony CERAMI, Carla Cerami, VLN LLC, and
Cerami Consulting Corporation,
Defendants.
**No. 00 CIV. 4024(AGS).**

Feb. 16, 2001.

MEMORANDUM ORDER

SCHWARTZ, District J.

**\*1** In this action, plaintiffs allege securities fraud and insider trading, pursuant to Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § § 78 *et seq.,* in connection with the purchase and sale of securities in a company, Applied Vaccine Technologies Corp. ("AVT"), formed by the parties to develop virtual lymph node technology. [FN1] They also allege several state law claims based on the same transaction. Currently before the Court are (i) defendants' motion to dismiss all claims pursuant to Fed.R.Civ.P. 12(b)(1), 12(b)(6), and 9(b), and Section 21D of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), and (ii) plaintiffs' cross-motion for expedited discovery pursuant to 15 U.S.C. § 78u-4(b)(3)(B). For the reasons set forth below, plaintiffs' motion is granted, and defendants' motion will be held in abeyance pending the completion of plaintiffs' requested discovery.

> FN1. This technology involves a tiny tubular capsule, i.e. a virtual lymph node, that is inserted under a patient's skin in order to trigger certain reactions in the patient's immune system. (Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss and in Support of Their Cross-Motion for Relief from Stay of Discovery ("Pl.Mem.") at 2-3; Transcript dated Feb. 7, 2001 ("Tr.") at 3:6-20.)

I. Factual Background

Plaintiff Vacold LLC ("Vacold"), a Delaware limited liability company with its principal place of business in New York, New York, is the successor-in-interest to plaintiff Immunotherapy, Inc. ("Immuno"), a Delaware corporation which was dissolved in or around 1999. (Compl.¶ ¶ 7-8.) Like defendant Cerami Consulting Corporation ("Cerami Corp."), a Delaware corporation with its principal place of business in Tarrytown, New York, plaintiffs are biomedical research companies. Their research centers at least in part on vaccine technologies.

The individual defendants, Drs. Anthony and Carla Cerami (the "Ceramis"), are citizens of New York and officers of Cerami Corp. [FN2] and its subsidiary, Virtual Lymph Node LLC ("VLN"), a Delaware limited liability company with its principal place of business in Tarrytown, New York. (*Id.* ¶ ¶ 10-12.)

> FN2. Carla Cerami is also a majority shareholder of Cerami Corp. (Compl.¶ 12.)

On November 18, 1997, Immuno and Cerami Corp. entered into a letter agreement pursuant to which the companies agreed to collaborate on the development of three technologies, including virtual lymph node technology. (Compl. ¶ 15; Affidavit of Eugene P. Souther dated Sept. 27, 2000 ("Souther Aff."), Ex. 2.) On March 2, 1998, the companies and/or their individual officers filed a patent application for the technology. (Compl. ¶ 16; Tr. at 4:9-13 .) In May 1998, the companies founded a corporation to carry on their venture, which subsequently became known as Provax, Inc. (Compl. ¶ 17; Affirmation of C. Leonard Gordon, Esq. dated Nov. 7, 2000 ("Gordon Aff."), Ex. A.) Pursuant to a series of agreements signed on October 8, 1998, the parties changed Provax, Inc.'s name to Applied Vaccine Technologies ("AVT"), increased the number of outstanding shares of the corporation, agreed to jointly develop the virtual lymph node technology through AVT, and assigned the patent to AVT. (Compl. ¶ 17; Ex. A to Gordon Aff.) The parties contemporaneously executed a Stockholders Agreement pursuant to which each was given 50 percent of AVT's 100,000 issued shares. (*Id.*) Dr. Anthony Cerami and C. Leonard Gordon ("Gordon"), then CEO of Immuno, (Ex. 6. to Souther Aff. at 6), were each made co-

Not Reported in F.Supp.2d                                                                    Page 2
2001 WL 167704 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,334
**(Cite as: 2001 WL 167704 (S.D.N.Y.))**

presidents and co-CEOs of AVT. (Compl.¶ 18.) Plaintiffs state that AVT was a joint venture, while defendants dispute this characterization. (Compl. ¶ 61; Pl. Mem. at 11-12; Tr. at 5:18-24.)

**\*2** During 1998, in particular the summer and fall, (Tr. at 4:14-17), representatives of the parties approached a number of pharmaceutical companies for investment in the technology. Among these companies were Johnson & Johnson and its subsidiary Ortho Biotech (collectively, "J & J"), with whom approximately four meetings were held. (Compl.¶ 19.) At a meeting held on August 31, 1998, Dr. Anthony Cerami advised Gordon that while certain companies had expressed initial interest in the technology, none were willing to invest. (*Id.*)

By memorandum dated October 16, 1998, eight days after the companies had entered into the October 8, 1998 agreements, Immuno represented to Cerami Corp. that Immuno was in danger of running out of money. (Compl. ¶ 20; Ex. 4 to Souther Aff.) In a letter dated December 16, 1998, Cerami Corp., realizing the "difficulties" facing AVT, offered to either sell its interest in AVT to Immuno or to buy Immuno's interest in AVT. (Compl. ¶ 21; Ex. B to Gordon Aff .) Cerami Corp. stated that it (i) had decided not to proceed in jointly developing the technology, and (ii) did not believe that the technology could be developed productively if each company worked on it separately. (*Id.*) By letter dated January 22, 1999, Cerami Corp., accented that Immunotherapy was "basically out of money," and, referencing a meeting between the parties apparently held as a consequence of the December 16, 1998 letter, outlined a proposal pursuant to which Cerami Corp. would purchase Immuno's AVT shares for $1 million and a share of future royalties. (Compl. ¶ 21; Ex. 5 to Souther Aff.)

On April 9, 1999, the parties signed a preliminary agreement pursuant to which Cerami Corp. would acquire Immuno's AVT shares for (i) $1 million, (ii) ongoing royalties of 1.5 percent on the sale of "Virtual Lymph Node products,"  [FN3] (iii) 8.5 percent of net proceeds from any licensee, sublicensee, or joint venture for the virtual lymph node technology, and (iv) a minimum royalty, inclusive of the above payments, of $50,000 per year for each of the ten years following the closing date. (Compl. ¶ 23; April 9 Agreement ¶¶ 1-3.) In addition, the parties agreed to share co-exclusive worldwide rights to develop the virtual lymph node technology in non-human animals. (April 9 Agreement ¶ 6.) The transaction would close when

Cerami Corp. had obtained certain financing, on the condition that such financing could not come from Coulter Pharmaceutical Corp. ("Coulter"), a company which had, according to defendants, previously expressed interest in investing in the technology. [FN4] (*Id.* ¶ 3; Pl. Mem. at 6.) Further, as part of the transaction, Cerami Corp. would form "Newco", which would own all of the shares in AVT. (*Id.* ¶ 1.) Newco subsequently became defendant VLN.

> FN3. The Agreement defined such products as "any product that combines multiple technologies into a single marketable product that cannot function without the benefit of Virtual Lymph Node technology (e.g. a combination of a vaccine and the Virtual Lymph Node)." (Letter Agreement dated April 9, 1999, Ex. 6 to Souther Aff., ¶ 2a .)

> FN4. The financing provision of the Agreement stated as follows:
> Immuno understands and acknowledges that the Transaction is subject to and conditioned upon Cerami Consulting obtaining financing at terms and with a tax consequence[ ] acceptable to Cerami Consulting in its sole discretion on or before April 1, 1999 (the "Financing"); provided, however, that the date shall be extended to May 1, 1999 if, on or prior to April 1, 1999, Cerami Consulting (or its financing party) states in writing to you that a closing is scheduled prior to June 1, 1999 with a credit worthy person to invest not less than $1,000,000 in Cerami Consulting, AVT, or Newco. Cerami Consulting will not obtain the Financing from Coulter Pharmaceutical Corporation." (April 9 Agreement ¶ 3.)

Plaintiffs state that by letter dated April 22, 1999, Cerami Corp. informed Immuno that it had $1 million in cash in its accounts to finance the transaction. (Compl. ¶ 24; Defendants' Memorandum in Support of their Motion to Dismiss the Complaint ("Def.Mem.") at 7.) On June 1, 1999, the deal closed under largely equivalent terms to those enumerated in the April 9 Agreement, and the parties signed a new Stock Purchase Agreement (governing the purchase and sale of Immuno's AVT shares) and a Consulting Agreement (governing the royalties to be awarded to Immuno). (Compl. ¶ 26; Exs. 7, 8 to Souther Aff.)

**\*3** In the spring of 2000, through an inspection of VLN's books, which was contemplated by the June 1,

Not Reported in F.Supp.2d                                                                    Page 3
2001 WL 167704 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,334
**(Cite as: 2001 WL 167704 (S.D.N.Y.))**

1999 Agreements, (Consulting Agreement § 3.1), Vacold discovered that J & J had provided $3 million to the Ceramis, specifically, $300,000 to AVT and, through Ortho Biotech, $2.7 million to VLN. (Compl.¶ 32.) J & J's payments were purportedly made in June 1999. (*Id.*) There is no document or statement in the record that establishes the timing of (i) the commencement of J & J's interest in AVT or VLN, (ii) J & J's agreement to provide funds to these companies, or (iii) the actual transfer of funds from J & J.

 In this action, filed on May 26, 2000, plaintiffs allege that the Ceramis conspired to defraud them by inducing Immuno to sell its shares in AVT when financing was in fact available from (and an agreement sealed with) J & J. Specifically, plaintiffs allege that "Defendants intentionally, knowingly, and/or recklessly made misrepresentations to Plaintiffs about the lack of pharmaceutical interest in AVT and the Virtual Lymph Node." (Compl.¶ ¶ 35, 36, 47.) Plaintiffs assert seven causes of action under federal and state law: (i) against all defendants for securities fraud and insider trading, in violation of Section 10(b) and Rule 10b-5 of the 1934 Act; (ii) against all defendants for common law fraud; (iii) against the Ceramis and Cerami Corp. for negligent misrepresentation; (iv) against the Ceramis and Cerami Corp. for breach of fiduciary duty; (v) against VLN for unjust enrichment; (vi) against all defendants for prima facie tort; and (vii) against the Ceramis and VLN for controlling person liability. The instant motions followed. Pursuant to the provisions of the PSLRA, specifically, 15 U.S.C. § 78u-4(b)(3)(B), discovery was stayed upon defendants' filing of their motion to dismiss on September 27, 2000.

II. Discussion

 A. Motion to Dismiss Standard

 On a motion to dismiss, the Court must accept the factual allegations contained in the Complaint as true, and draw all reasonable inferences in favor of the non-movant; it should not dismiss the Complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45- 46 (1957); *see also Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164 (1993) (noting that factual allegations in complaint must be accepted as true on motion to dismiss); *Press v. Quick & Reilly, Inc.,* 18 F.3d 121, 128 (2d Cir.2000) (same).

In deciding a motion under Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)"), the Court may consider "facts stated on the face of the complaint and in documents appended to the complaint or incorporated in the complaint, as well as [ ] matters of which judicial notice may be taken." *Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.,* 155 F.3d 59, 67 (2d Cir.1998). When matters extrinsic to the pleadings are presented on a motion to dismiss for failure to state a claim under Rule 12(b)(6), the district court must either exclude the additional material and decide the motion on the Complaint alone or convert the motion to one for summary judgment and afford all parties the opportunity to present supporting material. *See Morelli v. Cedel,* 141 F.3d 39, 46 (2d Cir.1998) (citing *Carter v. Stanton,* 405 U.S. 669, 671 (1972)). In this case, the Court declines to consider matters outside of those permissible under Rule 12(b)(6), and chooses not to convert the motion into one for summary judgment. [FN5]

> FN5. Both parties have submitted affidavits and documentary exhibits in support of their submissions. The Court declines to consider the affidavits, but will consider those exhibits which are referenced in the Complaint or incorporated therein by reference. *See Int'l Audiotext Network v. Am. Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (citation and internal quotations omitted).

 B. Defendants' Motion to Dismiss

 1. Parties' Positions

 **\*4** Defendants move to dismiss the Complaint against them (i) pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, (ii) pursuant to Rule 9(b) and Section 21D of the Private Securities Litigation Reform Act ("PSLRA") for failure to plead fraud with particularity, and (iii) pursuant to Rule 12(b)(1) for dismissal of the state law claims for lack of subject matter jurisdiction.

 In urging dismissal, defendants contend that their

Not Reported in F.Supp.2d                                                                          Page 4
2001 WL 167704 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,334
**(Cite as: 2001 WL 167704 (S.D.N.Y.))**

alleged misrepresentation and/or omission concerning the financing from J & J occurred after Immuno had agreed to sell its shares in AVT to defendants. [FN6] Thus, "because Plaintiffs' investment decision was made on April 9, 1999, and the J & J financing is alleged to have been provided in June 1999, Defendants could not possibly have made any misrepresentation or omission in connection with their purchase of Immunotherapy's shares." (Defendants' Reply Memorandum in Further Support of Their Motion to Dismiss the Complaint and in Opposition to Plaintiffs' Cross-Motion for Expedited Discovery ("Def.Rep.") at 2.) Defendants further assert that there was nothing in the April 9 Agreement that would have allowed plaintiffs to avoid the Agreement based on the source of financing for the transaction, other than the provision stating that Coulter could not be the source. (Def. Mem. at 12.) They state that because they were not obligated to disclose the source of the financing other than Coulter, "Immunotherapy did not rely on disclosure or omission of disclosure of the source of funding in making its investment decision." (*Id.* at 16.)

> FN6. Defendants also assert that Dr. Anthony Cerami's representation on August 31, 1998 that no pharmaceutical company was interested in investing in AVT was (i) not false or misleading, and (ii) not made in connection with the purchase or sale of a security, thus making such statement non-actionable under the securities laws. (Def. Mem. at 11 & n. 9; Tr. at 4:19-5:2.) Defendants further state that any of their other alleged statements concerning the unavailability of investment are not specified in the Complaint, and in any event would be non-actionable for the same reasons as the August 31, 1998 statement. (Def. Mem. at 11 & n. 9, 10; Tr. at 5:3-8.)

In contrast, plaintiffs contend that this case is an example of a "classic" securities fraud, mirroring the violations in *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir.1968) (en banc), in which insiders of a mining company bought the company's securities without disclosing material information to the public regarding the company's discovery of a valuable mineral site. (Pl. Mem. at 1.) Plaintiffs state that, like the insiders in *Texas Gulf Sulphur,* defendants were required to disclose the $3 million investment from J & J to their co-shareholders before they bought Immuno's AVT shares. [FN7] Plaintiffs further contend that April 9, 1999 is not the critical date with

regard to the existence of fraud, because the April 9 Agreement did not bind Immuno to sell its shares. [FN8] Rather, June 1, 1999 is the critical date. Since defendants evidently agreed on J & J's investment prior to June 1, 1999, plaintiffs assert, defendants should be liable for fraudulent non-disclosure. (Pl. Mem. at 7-10, 14-18.) Plaintiffs further argue that defendants' agreement with J & J on the terms of the latter's financing may even have occurred prior to the signing of the April 9 Agreement, and they cross-move for the Court to lift the PSLRA's mandatory stay of discovery in order to establish when such agreement was reached. [FN9] (Pl. Mem. at 7, 26-27.)

> FN7. Plaintiffs also assert that defendants owed a fiduciary duty to disclose J & J's investment, and to update or correct their previous statements concerning the availability of financing, because the parties were joint venturers in AVT pursuant to the terms of the October 8, 1998 Agreements. Moreover, plaintiffs assert that under Delaware law, officers and directors of a closely held corporation owe a fiduciary duty to each other. (Pl. Mem. at 10-14.)

> FN8. At oral argument and in a follow-up letter to the Court, plaintiffs argued, for the first time, that J & J's $3 million payment to AVT and VLN was not "financing" as contemplated by the parties under the Agreement, but rather "funding," or "an investment in the business," which was the equivalent of "uranium in the backyard." (Tr. at 28:1-29:17.) Specifically, plaintiffs argued that (i) "financing" referred solely to the $1 million for the purchase of Immuno's shares, and (ii) such financing was to be provided to Cerami Corp., not AVT or Newco. As such, J & J's investment was not encompassed by the April 9 Agreement's financing provision, because it was a larger investment and was directed to AVT and VLN, not Cerami Corp. (*Id.*) The implication of this line of argument is that the payment had to be disclosed regardless of the existence of the financing provision. The Court finds this contention unavailing, because it contradicts the express terms of the Agreement and requires the Court to assume several facts about the parties' negotiations that appear nowhere in the record. The financing provision specifically contemplates an agreement "with a credit

Not Reported in F.Supp.2d                                                                                    Page 5
2001 WL 167704 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,334
(Cite as: 2001 WL 167704 (S.D.N.Y.))

worthy person to *invest not less than $1 million in [Cerami Corp.], AVT, or Newco.*" (April 9 Agreement ¶ 3) (emphasis added .) Moreover, the absence of any distinction in the Agreement between "funding" or "investment" and "financing" is telling, given that a substantial investment in AVT or VLN would have been expected by the parties to carry out the commercial development of the virtual lymph node technology, from which plaintiffs were to receive royalties.

FN9. Plaintiffs' cross-motion, and the operation of the PSLRA's discovery stay, are addressed *infra*.

2. Consideration of the Motion Is Precluded on the Current Record

**\*5** In order to state a claim under Section 10(b) or Rule 10b-5 of the 1934 Act, a plaintiff must allege, in connection with the purchase or sale of a security, that the defendant (i) made a material misrepresentation or omission, (ii) with an intent to deceive or defraud, (iii) that the plaintiff detrimentally relied on the statement, and (iv) suffered damages as a result. *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995).

In this case, the alleged misrepresentation was defendants' failure to disclose the existence of J & J's investment, on which plaintiffs allegedly relied in selling their shares in AVT, and suffered monetary damages. (Com pl.¶ ¶ 34-40.) As noted *supra*, defendants urge the dismissal of plaintiffs' securities fraud claim based on their assertion that the purchase and sale irrevocably occurred on April 9, 1999, and state that the alleged misrepresentation was non-actionable because, according to the Complaint, it occurred after that date. Plaintiffs contend that the June 1, 1999 Stock Purchase Agreement marked the definitive date of the sale, and that any non-disclosure occurring before this date is actionable.

Whether the April 9 Agreement constituted a binding sale is a question of law for the Court to decide. Both parties acknowledge that the April 9 Agreement was an "agreement," but they disagree as to whether it irrevocably bound Immuno to sell its shares in AVT. (Pl. Mem. at 14-17; Def. Rep. at 5-12; Tr. at 29:21.) Defendants contend that the Agreement is binding, because, *inter alia*, (i) it was reduced to writing and signed by both parties, (ii) it contains the principal negotiated terms that formed

part of the June 1, 1999 Agreements, including subject matter, rights of the parties after closing, consideration, and financing obligations, and (iii) penalizes each party in the event of non-compliance. (Def. Rep. at 6-8.) On the other hand, plaintiffs contend that, by its terms, the April 9 Agreement was "contingent and uncertain," as it envisaged a "potential acquisition" that was only "presently contemplated," and reflected several future events that would not necessarily occur. (Pl. Mem. at 4-6, 16-17; Tr. at 30:17-31.) They further contend that Immuno was not bound to sell because it had several options under the terms of the Agreement, in particular the ability to "refus[e] to comply with the provisions of this letter." (Tr. at 31:5-25; April 9 Agreement ¶ 7.)

At this stage of the proceedings, the Court need not determine the extent to which the April 9 Agreement constituted a binding sale, because important questions of fact remain with regard to the timing of the alleged non-disclosure that preclude the Court from ruling on defendants' motion to dismiss. Drawing all reasonable inferences in plaintiffs' favor, the Court declines to accept defendants' argument that the Complaint asserts that the alleged non-disclosure occurred after April 9, 1999. The Complaint states that J & J's payments to AVT and VLN were made in June 1999. However, contrary to defendants' contention, (Tr. at 17:23-18:2), this assertion does not suggest that J & J's agreement to invest was made in June 1999; rather, the reasonable inference to be drawn is that the relevant payments had been agreed to prior to that date. Moreover, in their motion papers, plaintiffs assert that defendants may in fact have secured funding from J & J prior to April 9, 1999. (Pl. Mem. at 7, 26-27.) Defendants, for their part, have not directly addressed the timing of their business dealings with J & J, asserting that there is no allegation in the Complaint that any agreement regarding funding was reached prior to the execution of the April 9 Agreement, or even by June 1, 1999. [FN10] At oral argument, moreover, counsel for defendants declined to disclose the timing of its commercial dealings with J & J or any agreement that had been reached. (Tr. at 14:5, 16:4-7, 27:4-7.)

FN10. They further argue that, even if there were such a prior agreement, the timing is irrelevant given that (i) plaintiffs waived their right to assert a dispute concerning financing, because financing terms were specifically negotiated in the April 9 Agreement, and (ii) beyond discussions related to Coulter's potential investment in

AVT, plaintiffs never asked for a representation as to whom defendants had approached for financing. (Tr. at 14:7-15:22; Letter from Eugene Souther to the Court dated Feb. 9, 2001.) The Court defers consideration of these issues until after the limited discovery, authorized *infra*, has been completed.

**\*6** Thus, there is nothing in the record that indicates when defendants secured financing or an agreement to finance from J & J, information which is critical to the prosecution of plaintiffs' claims. [FN11] The Court finds that the absence of such information precludes consideration of the sufficiency of plaintiffs' securities fraud claim at this time. The Court therefore holds defendants' motion to dismiss this claim in abeyance pending the completion of discovery on the issue of defendants' involvement with J & J. [FN12] Moreover, because the sufficiency of, and the Court's willingness to take jurisdiction over, each of plaintiffs' state law claims may be directly implicated by the Court's ultimate determination as to the securities fraud claim, the Court likewise holds defendants' motion to dismiss in abeyance with respect to these claims pending the outcome of the limited discovery.

> FN11. Specifically, if, as plaintiffs contend, the April 9 Agreement was not binding, then any agreement on financing between defendants and J & J that occurred before the termination of the parties' relationship in June 1999 may be relevant to the alleged fraud. However, if, as defendants contend, the April 9 Agreement constituted a binding sale, then the only relevant period for examination of defendants' financing activity is prior to the signing of the April 9 Agreement.

> FN12. The specific parameters of the Court's authorized discovery are discussed in the next section.

C. Plaintiffs' Cross-Motion For Expedited Discovery

In their cross-motion, plaintiffs state that "if the court concludes that Plaintiffs made their binding investment decision as of the April Letter, the Court should allow discovery to determine whether [J & J]'s interest in AVT and willingness to invest in it arose prior to April 1999." (Pl. Mem. at 26.) While the Court has declined to rule at this stage on the enforceability of the April 9 Agreement, *see supra*, it

nevertheless believes that plaintiffs' requested discovery is warranted in this case.

Section 21D(b)(3)(B) of the 1934 Act, added as part of the PSLRA, reads in pertinent part:

> In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

15 U.S.C. § 78u-4(b)(3)(B). Congress enacted the PSLRA to redress certain perceived abuses in securities class actions, including "the abuse of the discovery process to coerce settlement." *In re Advanta Corp. Secs. Lit.,* 180 F.3d 525, 530-31 (3d Cir.1999). In enacting provisions such as the mandatory stay of discovery, Congress was reacting to testimony that "the cost of discovery often forces innocent parties to settle frivolous securities class actions." H.R. Conf. Rep. No. 104-369, at 37 (1995). Congress also was concerned that "plaintiffs sometimes file lawsuits in order to conduct discovery in the hopes of finding a sustainable claim not alleged in the complaint." S.Rep. No. 104-98, at 14 (1995). Thus, unless exceptional circumstances are present, discovery in securities actions is permitted only after the court has sustained the legal sufficiency of the complaint. *Id.; Novak v. Kasaks,* No. 96 Civ. 3073(AGS), 1996 WL 467534, at *1 (S.D.N.Y. Aug. 16, 1996).

The Second Circuit has not yet interpreted the PSLRA's discovery stay provision. However, courts have defined the "undue prejudice" sufficient to overcome the statutory bar as "improper or unfair treatment" amounting to something less than irreparable harm. *Med. Imaging Ctrs. of Am., Inc. v. Lichtenstein,* 917 F.Supp. 717, 720 (S.D.Cal.1996). Moreover, several courts, including at least one in this district, have lifted the discovery stay on grounds of "undue prejudice" where defendants might be shielded from liability in the absence of the requested discovery. *See, e.g., Global Intellicom, Inc. v. Thomson Kernaghan & Co.,* No. 99 Civ. 342, 1999 WL 223158, at *2 (S.D.N.Y. Apr. 16, 1999) (finding that the plaintiff had "made a showing of undue prejudice to justify taking particularized discovery," in the absence of which plaintiff might have been prevented from seeking redress for the alleged violations); *Med. Imaging,* 917 F.Supp. at 720 (stating that a stay of discovery would cause undue prejudice where it may "shield ... [defendants] from eventual liability for any material violations of the

Not Reported in F.Supp.2d                                                                                                Page 7
2001 WL 167704 (S.D.N.Y.), Fed. Sec. L. Rep. P 91,334
**(Cite as: 2001 WL 167704 (S.D.N.Y.))**

securities laws"); *cf. In re Carnegie Int'l Corp. Secs. Litig., 107 F.Supp.2d 676, 684 (D.Md.2000)* (declining to lift discovery stay on the ground that the requested discovery was irrelevant to the pending motion to dismiss). *But see SG Cowen Secs. Litig. v. United States Dct. Ct. for the N. Dist. of Cal., 189 F.3d 909, 912 (9th Cir.1999)* (quoting *Medhekar v. United States Dist. Ct., 99 F.3d 325, 328 (9th Cir.1996)* (stating that complaints in federal securities actions "should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed")).

 *7 Defendants claim that, in requesting a removal of the discovery stay, plaintiffs are "attempt[ing] ... to use discovery as a fishing expedition ... in the desperate hope of finding something to justify their unfounded claim." (Def. Rep. at 20.) The Court disagrees. The record reflects that plaintiffs have requested particularlized discovery solely related to the nature and timing of J & J's interest in AVT and VLN, and its agreement to invest in those companies. This request does not implicate a concern that plaintiffs are seeking discovery to coerce a settlement or to support a claim not alleged in the Complaint. H.R. Conf. Rep. No. 104-369 at 37 (1995); S.Rep. No. 104- 98, at 14 (1995). Rather, the removal of the PSLRA's discovery stay is warranted on grounds of undue prejudice, because the failure to allow discovery on the limited issue of the nature and timing of J & J's interest and investment in AVT and VLN may unfairly insulate defendants from liability for securities fraud as alleged by plaintiffs in the Complaint. Moreover, defendants' failure to specify the timing of their negotiations with J & J concerning the latter's investment further suggests the possibility that plaintiffs would suffer improper or unfair treatment in the absence of the requested discovery. Accordingly, the Court orders that the stay be lifted in order to allow plaintiffs to conduct discovery on this limited issue.

 III. Conclusion

 For the foregoing reasons, plaintiffs' motion for expedited discovery is granted, and defendants' motion to dismiss is held in abeyance pending the outcome of discovery on the limited issue of the nature and timing of J & J's interest and investment in AVT and VLN.

 SO ORDERED.

 2001 WL 167704 (S.D.N.Y.), Fed. Sec. L. Rep. P

91,334


END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
ENTERED

FEB 28 2002

Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MARK NEWBY, ET AL., | } |
| Plaintiffs | } |
| | } |
| VS. | } CIVIL ACTION NO. H-01-3624 |
| | } AND CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | } |
| Defendants | } |
| | |
| PIRRELLI ARMSTRONG TIRE CORPORATION | } |
| RETIREE MEDICAL BENEFITS TRUST, | } |
| Derivatively On Behalf of ENRON CORPORATION, | } |
| ET. AL., | } |
| Plaintiffs | } |
| | } |
| VS. | } CIVIL ACTION NO. H-01-3645 |
| | } AND CONSOLIDATED CASES |
| KENNETH LAY, ET AL., | } |
| Defendants | } |
| | |
| PAMELA M. TITTLE, on behalf of herself and | } |
| a class of persons similarly situated, ET AL., | } |
| Plaintiffs | } |
| | } |
| VS. | } CIVIL ACTION NO. H-01-3913 |
| | } AND CONSOLIDATED CASES |
| ENRON CORP, an Oregon Corporation, ET AL., | } |
| Defendants. | } |

## SCHEDULING ORDER

On February 25, 2002 this Court held a scheduling conference participated

in by the consolidated *Tittle* parties and the consolidated *Newby* parties. The Court heard

326

from plaintiffs and defendants in each case and has considered the arguments of all sides. The consolidated *Pirrelli* case has been automatically stayed by the Enron bankruptcy proceeding and remains so.[1] That stay of claims against Enron Corporation in the *Tittle* consolidated action was lifted by The Hon. Arthur J. Gonzalez, United States Bankruptcy Judge, Southern District of New York, for the limited purpose of allowing, *inter alia*, Enron to participate in the scheduling of the *Tittle* case.

The Court is mindful that the eyes of the nation are on this Court and the civil justice system to see if we are up to the challenge of giving to all parties in these suits their day in court. It is the nation's impression that the justice system grinds slowly in a Dickensian fashion, and it is the hope of this Court that that impression can be changed by an efficient resolution of these cases. To that end, the Court finds that the agreed to and proposed schedules submitted by the plaintiffs and defendants are each deficient in some respect. The Court has taken into account the positions and arguments of each group of parties and has fashioned what the Court believes to be a workable schedule, one that will require the expenditure of a great deal of time and energy by the lawyers and parties, but one that will bring this case to resolution in as short a time frame as humanly possible, while serving the interests of justice. The scheduled dates are considered by this Court to be FIRM DATES. These are not floating dates subject to change without sufficient reason. By separate order the Court will establish a monthly conference call so that counsel and the Court may confer. Accordingly, it is hereby

---

[1]At this time, because the Detective Endowment Association Annuity Fund has moved in the Bankruptcy Court to lift the stay as to the shareholder derivative suits, the Court chooses not to administratively close the *Pirrelli* action.

**ORDERED** that the *Newby* and *Tittle* plaintiffs and defendants shall confer within the next ten days and as promptly as possible take the steps necessary to set up and fund in Houston, Texas, a document depository for the receipt and maintenance of discovery in all of these consolidated cases. The depository shall be accessible to the attorneys for all parties. The logistics of setting up the depository and protocols for access and copying will be left to the professionalism of experienced counsel. It is further

**ORDERED** that, pursuant to the order of the Honorable Arthur J. Gonzalez, United States Bankruptcy Judge for the Southern District of New York, partially lifting the bankruptcy stay, Enron Corporation will produce, subject to attorney client privilege or work product protection:

> (1) a copy of all documents and materials Enron has produced since filing for bankruptcy in connection with any inquiry(ies) or investigation(s) into the Company's handling of its ERISA-governed pension plans, that were provided, or that may be provided, pursuant to subpoena
>
>> (a) by any committee of the Legislative branch of the United States Government, or
>>
>> (b) by the Executive branch of the United States Government, including, but not limited to, the Department of Labor, and
>
> (2) copies of all transcripts of witness interviews or depositions in Enron's possession, custody or control, given or taken in connection with said inquiry(ies) or investigation(s).

These copies of documents, transcripts and depositions shall be deposited in the document depository in Houston, Texas by April 1, 2002 and made available to all lawyers in both the consolidated *Tittle* and *Newby* cases. The automatic stay of discovery

mandated by the PSLRA was designed to prevent fishing expeditions in frivolous securities lawsuits.  It was not designed to keep secret from counsel in securities cases documents that have become available for review by means other than discovery in the securities case.  Furthermore, as pointed out during the hearing, the *Tittle* plaintiffs are included within the putative class of the *Newby* case.  Any materials withheld because of privilege or work product shall be documented in a privileged log.  It is further

ORDERED that interrogatories, requests for admissions, and document requests that plaintiffs in the *Newby* or *Tittle* case wish to propound to defendants, including Enron, be proposed as soon as possible so that, should any claims survive the motions to dismiss, the *Newby* and *Tittle* defendants will have had an opportunity to review the discovery requests during the pendency of the motions to dismiss and can respond within a reasonable time frame after a ruling on the motions, should a response be necessary.  In no event shall Enron's answer, objection, or other response to the discovery be required until the bankruptcy stay is lifted for all purposes on June 21, 2002, pursuant to Judge Gonzalez's Order.  It is further

ORDERED that the plaintiffs in the *Tittle* case, inasmuch as they are not subject to the PSLRA stay of discovery, may immediately begin any discovery unique to their case that has not been stayed in the *Newby* case by the PSLRA.  All discovery shall be placed in the document depository in Houston, Texas.  It is further

ORDERED that expert witnesses, whether on the class issues or on the merits of the case, shall be designated by a party and shall file at that time a comprehensive expert report.  The counter expert must then be designated and provide his or her comprehensive report.  Waiting to depose the counter expert until after a first

designated expert has been deposed will unnecessarily prolong the discovery process.

Accordingly, it is hereby

ORDERED that the Pretrial Scheduling Order, which shall apply to the

consolidated *Tittle* and *Newby* cases shall be as follows:

| | |
|---|---|
| Consolidated Complaints filed by | April 1, 2002 |
| Motions to dismiss due | May 1, 2002 |
| Opposition to Motions to dismiss | June 3, 2001 |
| Replies to Opposition to Motions to dismiss | June 17, 2002 |
| Class discovery begins | July 1, 2002 |
| Class discovery ends | September 2, 2002 |
| Plaintiffs' Motions for Class Certification | October 1, 2002 |
| Defendants' Opposition | November 1, 2002 |
| Plaintiffs' Replies | December 2, 2002 |
| Deadline to join new parties or to file third party complaints or cross complaints/claims: | January 2, 2003 |
| All fact discovery completed by | April 1, 2003 |
| Plaintiffs' expert witnesses named and a comprehensive report of the experts' opinions furnished by | April 15, 2003 |
| Defendants' expert witnesses named and a comprehensive report of the experts' opinions furnished by | May 15, 2003 |
| Expert Discovery completed by | July 2, 2003 |
| Motions for Summary Judgment and all other dispositive motions filed and served by | August 15, 2003 |
| Joint Pretrial Order filed by | October 15, 2003 |
| Plaintiffs are responsible for filing the Pretrial Order on time. | |
| Docket Call is set for 1:30 pm | November 14, 2003 |
| Trial is set for 9:00 am | December 1, 2003 |

**SIGNED** at Houston, Texas, this 27th day of February, 2002.


_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE



Not Reported in F.Supp.2d                                                                                 Page 1
2000 WL 33201904 (D.Or.), Fed. Sec. L. Rep. P 91,308
**(Cite as: 2000 WL 33201904 (D.Or.))**

**Motions, Pleadings and Filings**

United States District Court, D. Oregon.
In re FLIR SYSTEMS, INC. SECURITIES
LITIGATION
**No. Civ. 00-360-HA.**

Dec. 13, 2000.

AMENDED [FN1] OPINION AND ORDER

FN1. This opinion has been amended to
correct errata on page three. The citation to
*"Palmquist"* in the original has been
amended to *"Cowen."* No substantive
changes have been made.

HAGGERTY, J.

I. Introduction and Background.

**\*1** Pending before the court are two motions: (1)
defendants' joint motion for reconsideration or, in the
alternative, stay of order permitting discovery; and
(2) defendants' joint motion for a protective order.
These motions relate to this court's Order of
November 14, 2000, in which the court, pursuant to
15 U.S.C. § 78u-4(b)(3)(B), allowed the plaintiffs to
depose former-Flir employee Steven Palmquist. That
order arose out of a November 13, 2000 hearing on
defendants' motion to dismiss plaintiffs' complaint for
failure to meet the heightened scienter pleading
requirements of the Private Securities Litigation
Reform Act ("PSLRA").

In response to the defendants' motion, plaintiffs
submitted a copy of a complaint filed in Oregon state
court by Palmquist. In his state-court complaint,
Palmquist alleged, among other things, that Flir's
Chief Financial Officer, Defendant Mark Samper,
and Flir's President, Defendant Ken Stringer, had
engaged in "improper accounting and reporting
practices relating to falsely booking sales and
revenue, and then subsequently reversing or
substituting the factitious sales after the relevant
reporting period had closed." (Palmquist Complaint
at ¶ 8.) The court found that the plaintiffs had
"identified a former Flir employee who has filed a

lawsuit alleging that defendants willfully engaged in
the same type of accounting irregularities that are at
the core of plaintiffs' complaint." (Order at 2.)
Palmquist, however, refused to talk to plaintiffs'
attorneys unless he was required to do so pursuant to
a subpoena. (*Id.*) As a result, the court ruled that
"undue prejudice would result if it were to grant
defendants' motion to dismiss without allowing
plaintiffs to depose Palmquist so that they may plead,
if they can, particularized facts corroborating their
allegations that defendants willfully engaged in
fraud." (Order at 2.) The court also denied
defendants' motion to dismiss without prejudice, and
allowed plaintiffs to replead their allegations in an
amended complaint. Plaintiffs have now submitted an
affidavit averring that Palmquist refused to talk to
them because defendants essentially threatened
Palmquist with legal action if he did so. (Larson Aff.
at ¶ 5.)

On November 29, 2000, defendants filed their
motion for reconsideration, arguing that this court
erred in allowing limited discovery as to Palmquist
under *SG Cowen Sec. v. United States District Court
for the Northern District of Cal.,* 189 F.3d 909 (9 th
Cir.1999). At the time of the hearing and the court's
order, neither the parties nor the court were aware of
the *Cowen* decision. On December 7, 2000,
defendants filed a motion for a protective order
barring the plaintiffs from taking Palmquist's
deposition, which is currently scheduled for
December 20 and 21, 2000, pending resolution of
their motion for reconsideration or a petition for writ
of mandamus from the Ninth Circuit. On December
8, 2000, defendants also petitioned the Ninth Circuit
for a writ of mandamus directing this court to vacate
its limited discovery order. The court notes that even
if the Ninth Circuit issues a writ of mandamus
regarding the Palmquist discovery, the court has
already given plaintiffs leave to file an amended
complaint so that their new allegations can be
reviewed.

II. Discussion.

**\*2** In *Cowen,* a district court allowed limited
discovery to proceed against the defendants despite
the stay imposed by the PSLRA. *Id.* at 911-12. The
district court in *Cowen* believed that the plaintiffs'
allegations did not satisfy the PSLRA's scienter
requirement, but came close to doing so. *Id.* at 912.

Not Reported in F.Supp.2d                                                                                    Page 2
2000 WL 33201904 (D.Or.), Fed. Sec. L. Rep. P 91,308
**(Cite as: 2000 WL 33201904 (D.Or.))**

The district court allowed plaintiffs to attempt to obtain those facts by ordering limited discovery from the defendants. The Ninth Circuit found that the district court erred, stating that "as a matter of law, failure to muster facts sufficient to meet the Act's pleading requirements cannot constitute the requisite 'undue prejudice' to the plaintiff justifying a lift of the discovery stay under § 78u-4(b)(3)(B)." *Id.* at 913. The case at bar is significantly different than *Cowen.*

   As an initial matter, the discovery in *Cowen* was directed against *the defendants.* In this case discovery has been allowed to proceed only as to *a single third party.* This distinction is not without importance. The PSLRA's stay on discovery was "intended to prevent unnecessary imposition of discovery costs on defendants." *Id.* at 911 (quoting H.R. Conf. Rep. No. 104-369, 104 th Cong. 1 st Sess. at 32 (1995), *reprinted in* 1995 U.S.C.C.A.N. Sess. 731). Congress was concerned, for example, that "the threat that time of key employees will be spent responding to discovery requests, including providing deposition testimony, often forces coercive settlements...." *Id.* (quoting 1995 U.S.C.C.A.N. Sess. at 733). Those concerns are not present here. Palmquist is not a defendant, nor is he a current employee of defendant. As a result, the reasons for the PSLRA's stay of discovery are diminished when discovery is sought only from a single third party, not a defendant.

   Additionally, unlike *Cowen,* the court has not allowed his deposition merely as part of a fishing expedition in hope that the person subject to the discovery might be able to provide something helpful to the plaintiffs. Here, Palmquist has already filed a civil complaint in state court that directly corroborates plaintiff's allegations of fraud. By placing in his civil complaint allegations of Flir's accounting fraud, Palmquist has verified that his allegations "are supported by evidence." Oregon Rule of Civil Procedure 17(providing sanctions for unsubstantiated allegations in civil complaints). As a result, it is highly likely that Palmquist, a third party, has significant information about defendants' alleged fraud, information which Palmquist has already certified in state court documents to be true.

   Finally, the only reason Palmquist has not already shared his information with the plaintiffs is that the defendants have essentially threatened him with legal action if he does so. In response to the motion for reconsideration, plaintiffs' have attached an affidavit of Steve Larson, one of plaintiffs' attorneys, which states as follows:
   **\*3** 3. In the course of our investigation of this

matter, plaintiffs' counsel learned that Steve Palmquist, the Vice President of Engineering, sent a memo to Ken Stringer, the CEO of Flir, in March, 1999 outlining accounting concerns. We also learned that Stringer and Flir refused to change these accounting practices so Palmquist resigned in July, 1999. According to Mr. Palmquist's attorney, Palmquist sent a resignation letter to the company that outlines the accounting misrepresentations.
   ...
   5. In mid-March, 2000, I contacted Mr. Palmquist's attorney, Samuel Nicholls, to ask for copies of the March, 1999 memo to String and the resignation letter. Mr. Palmquist's attorney told me he would provide documents to us, and he would allow us to meet with Mr. Palmquist. However, a day or so later, Mr. Palmquist's attorney informed us that the attorney for Flir defending Palmquist's lawsuit had demanded that the resignation letter and the March memorandum, as well as any other documents that Mr. Palmquist had regarding Flir, be returned to Flir or Palmquist would be in violation of confidentiality provision of an employment contract. Mr. Palmquist's attorney told us that because of this assertion by Flir, he would not be able to provide us with copies of the documents and he would not be able to make Mr. Palmquist available for an interview, absent a subpoena.

   (Larson Aff. at ¶ 5.) Thus, Palmquist is unavailable only because defendants have taken steps to ensure that Palmquist could not talk to plaintiffs or provide relevant documents without the protection of being ordered to do so pursuant to a subpoena.

   In their motion for reconsideration, defendants claim that deposing Palmquist is inappropriate and contrary to the PSLRA; yet, defendants have arranged that the information Palmquist possesses can be obtained only if he is deposed. The PSLRA is a shield intended to protect security-fraud defendants from costly discovery requirements, *Cowen,* 189 F.3d at 911, not to be a sword with which defendants can destroy the plaintiffs' ability to obtain information from third parties who are otherwise willing to disclose it. Allowing defendants to seek dismissal of plaintiffs' complaint without affording plaintiffs the opportunity to discover Palmquist's information regarding defendants' fraud-information which is known to exist and which has been withheld only as a result of defendants' efforts to silence Palmquist-would result in "undue prejudice" to plaintiffs.

   III. Conclusion.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2000 WL 33201904 (D.Or.), Fed. Sec. L. Rep. P 91,308
(Cite as: 2000 WL 33201904 (D.Or.))

 For the foregoing reasons, defendants' motion for reconsideration of the court's discovery order, (doc. 36), is denied. In order to allow the Ninth Circuit to decide defendants' petition for mandamus, however, the court shall grant defendants' motion for a protective order barring plaintiff's from taking the Palmquist deposition on December 20 and 21, 2000, (doc. 36), and defendants' motion for a stay of discovery pending a ruling by the Ninth Circuit on the mandamus petition, (doc. 38). The Clerk of the Court shall immediately send a copy of this Opinion and Order to the Ninth Circuit Court of Appeals for inclusion in the materials for its mandamus decision.

**\*4** IT IS SO ORDERED.


**Motions, Pleadings and Filings (Back to top)**

• 3:00CV00360 (Docket) (Mar. 13, 2000)

• 3:0000360 (Docket) (Mar. 13, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Exhibit F

Westlaw.

Not Reported in F.Supp.2d
2002 WL 31845114 (S.D.Tex.)
**(Cite as: 2002 WL 31845114 (S.D.Tex.))**

Page 1

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas, Houston Division.
In re ENRON CORPORATION SECURITIES,
DERIVATIVE & "ERISA LITIGATION
Mark NEWBY, et al., Plaintiffs
v.
ENRON CORPORATION, et al., Defendants
**Nos. MDL-1446, Civ.A. H-01-3624.**

Aug. 16, 2002.

*ORDER*

HARMON, J.

**\*1** THIS DOCUMENT RELATES TO: All Cases

Pending before the Court is Lead Plaintiff the Regents of the University of California's motion for a limited production of Enron documents (instrument # 802).

Lead Plaintiff explains that in the New York bankruptcy court it moved for a limited modification of the automatic stay as to Debtor Enron Corporation to obtain copies of all documents and materials produced by the Debtor related to any inquiry or investigation by any legislative branch committee, the executive branch, including the Department of Justice and the Securities and Exchange Commission, and all transcripts of witness interviews or depositions related to those inquiries. After review of the briefing and oral argument, on May 22, 2002 Judge Arthur Gonzalez lifted the automatic stay, provided that this Court determines that the PSLRA's discovery stay should be lifted, to require Enron to produce such documents, subject to any attorney-client privilege or work product protection asserted by Enron and a reasonable time for review. Ex. to Motion. Because these materials have already been made available to and reviewed by numerous governmental entities and others, Lead Plaintiff asks the Court to order the PSLRA's discovery stay to be lifted for the same reasons it did in its February 27,

2002 scheduling order, when it lifted the stay as to certain ERISA documents and made them available to both *Tittle* and *Newby* Plaintiffs because the PSLRA's discovery stay "was designed to prevent fishing expeditions in frivolous securities lawsuits" and "was not designed to keep secret from counsel in securities cases documents that have already become available for review by means other than discovery in the securities case." Feb. 27, 2002 Order (# 326) at 3-4.

Opposition has been filed by Enron Corporation (# 883), joined by Defendant Kenneth Lay (# 884) and Certain Officer Defendants (Richard Buy, Richard Causey, Kenneth Rice, Joseph M. Hirko, Stanley C. Horton, Steven Kean, Kevin Hannon, Mark Frevert, Mark Koenig, Jeff McMahon, Lawrence Whalley and Cindy K. Olson)(# 890). Emphasizing the unambiguous text of [15 U.S.C. § 78u-4(b)(3)(B)](#), [FN1] which allows only two exceptions to the PSLRA's ban on discovery during pendency of motions to discuss, Defendants note that Lead Plaintiff does not claim that it can show that particularized discovery is essential to preserve evidence or to prevent prejudice to Lead Plaintiff. They complain, "Plaintiff offers no authority or rationale for expanding the Court's Scheduling Order's accommodation of the ERISA claims to order wholesale production of hundreds of thousands of pages of documents in the securities case." Defendants insist that the PSLRA prohibits discovery requests, whether a "fishing expedition" or a "surgical strike." They argue that until the Court rules on the motions to dismiss challenging the legal sufficiency of the amended consolidated complaint, the securities action "should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed," as Congress intended. *SG Cowan Securities Corp. v. U.S.D.C. of the N.D. Cal., 189 F.3d 909, 912 (9th Cir.1999).*

> FN1. [Section 78u-4(b)(3)(B)](#) provides, In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon motion of any party that particularized discovery is necessary to preserve evidence or to prevent prejudice to that party.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2002 WL 31845114 (S.D.Tex.)
**(Cite as: 2002 WL 31845114 (S.D.Tex.))**

Page 2

**\*2** In reply, Lead Plaintiff underlines the point that this request does not "pose ... a threat of the abusive litigation threatened by the PSLRA" and that "Defendants therefore should not be allowed to hide behind the statute." While recognizing that the PSLRA's discovery stay protected Defendants from unnecessary discovery costs, Lead Plaintiff argues that here the burden would be slight because Enron has already found, reviewed, and organized the documents. The Court agrees. In a sense this discovery has already been made, and it is merely a question of keeping it from a party because of the strictures of a statute designed to prevent discovery abuse. Accordingly, the Court

ORDERS that the motion for limited production is GRANTED.

2002 WL 31845114 (S.D.Tex.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit G

FILED

JUL 1 9 1999

U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE BANKAMERICA CORP. SECURITIES LITIGATION | ) ) ) | MDL No. 1264 |

## ORDER

Before the Court is plaintiffs' motion to lift stay of discovery. For the reasons that follow, this motion is granted.

Plaintiffs in the above-captioned consolidated proceeding filed class action suits against BankAmerica in several different federal courts for alleged securities violations. These actions were consolidated in this Court by the Judicial Panel on Multidistrict Litigation on February 12, 1999. Seven concurrent state court class actions prosecuted by persons with a lesser financial stake than the federal plaintiffs are currently proceeding in California state court. Defendants filed a motion to dismiss in the federal action on May 21, 1999, thereby triggering the automatic discovery stay provision of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 77z-1(b)(1); 78u-4(b)(3)(B). This statute provides that

> . . . all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds, upon the motion of any party, that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

Id. Limited documentary discovery is ongoing in the California cases at this time.

The federal plaintiffs allege that the stay should be lifted because undue prejudice would result from the California plaintiffs obtaining a "head start" in the discovery process. Defendants dispute that such a "head start" is sufficient prejudice to justify lifting the stay. This Court finds that it is sufficient.

The legislative history provides that the stay is to be lifted only upon a finding that exceptional circumstances exist which would result in undue prejudice to the moving party. H. Rep. 104-369, at 63. The only courts to address the definition of "undue prejudice" under this portion of the PSLRA have found that undue prejudice sufficient to lift the stay is an "improper or unfair detriment." In Re Rational Software Sec. Litig. 28 F. Supp. 2d 562, 566 (N.D. Cal. 1998); Medical Imaging Ctrs. of Am., Inc. v. Lichtenstein, 917 F. Supp. 717, 720 (S.D. Cal. 1996). These courts also pointed out that one way a plaintiff could meet this standard is by showing that defendants would be shielded from liability if the stay remained in place. Rational Software, 28 F. Supp. 2d at 567; Medical Imaging Ctrs., 917 F. Supp. at 721 n.3. One court has also stated that the party seeking to lift the stay must point to particularized discovery necessary to prevent undue prejudice before the stay can be lifted. Mishkin v. Ageloff, 220 B.R. 784, 792-93 (S.D.N.Y. 1998).

Although defendants attempt to argue that the sole method of showing undue prejudice under the PSLRA is to show that defendants would be shielded from liability, this Court does not agree. Rational Software and Medical Imaging Ctrs. never stated that this was the only showing that would satisfy the undue prejudice standard. Rational Software, 28 F. Supp. 2d at 566 ("[A] plaintiff may demonstrate the existence of undue prejudice by

2

showing that refusal to allow discovery will shield the defendants from  liability for securities fraud.") (emphasis added); Medical Imaging Ctrs., 917 F. Supp. at 721 n.3 (stating that if plaintiffs had shown that defendants would be shielded from liability, the court would find undue prejudice).  Consequently, the fact that plaintiffs have made no showing that lack of discovery would shield defendants from liability is not dispositive of this motion to lift stay.

Plaintiffs have clearly shown the existence of exceptional circumstances[1] resulting in an improper or unfair detriment in this case.  One of the core policies of the PSLRA is that the persons with the largest financial interest in the relief sought by the class should control the conduct of the litigation.  15 U.S.C. § 78u-4(a)(3)(B)(iii).  The federal plaintiffs represent 2,583,505 shares of BankAmerica stock.  The California plaintiffs represent only 198,128 shares.[2]  That is, the federal plaintiffs' financial stake in this action is over thirteen times larger than the California plaintiffs' stake.  To allow the California plaintiffs early access to the core documents involved in the case and early control over the discovery process would in effect allow the tail to wag the dog.  Consequently, the Court finds that failure to lift the stay would result in undue prejudice to the federal plaintiffs.

---

[1] The existence of concurrent federal and state securities class actions is an exceptional circumstance in this Court's opinion.  The recently passed Securities Litigation Uniform Standards Act of 1998, P.L. 105-353, 112 Stat. 3227 (1998), would prevent such a situation from occurring in the future.  Thus, the precise issue involved in this case is unlikely ever to recur in federal court.

[2] Defendants accuse the California plaintiffs of double counting some shares to make their stake appear larger than it actually is.  For the purpose of this Order, the Court will assume that the above cited figures are accurate.

3

Additionally, the Court finds particularized discovery necessary to avoid this prejudice can be fashioned as follows. The federal plaintiffs shall be allowed to conduct discovery only to the extent that the California plaintiffs are conducting discovery. The federal plaintiffs shall be allowed access to all documents produced to the California plaintiffs under the existing requests for production propounded in the California actions as well as any other discovery that occurs pursuant to any coordinated discovery order before the resolution of defendants' motion to dismiss.

Accordingly,

IT IS HEREBY ORDERED that plaintiffs' motion to lift stay is granted to the extent that the federal plaintiffs shall have access to the same discovery materials that are or have been provided to the California plaintiffs.

_____
UNITED STATES DISTRICT COURT

Dated: JULY 19, 1999

4

*Westlaw.*

Not Reported in F.Supp.2d
2003 WL 23830479 (D.N.H.)
**(Cite as: 2003 WL 23830479 (D.N.H.))**

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court,
D. New Hampshire.
In re TYCO INTERNATIONAL, LTD.
MULTIDISTRICT LITIGATION (MDL 1335).
**No. MDL NO. 02-1335-B.**

Jan. 29, 2003.

Frederick E. Upshall, Jr., Upshall, Cooper & Temple, P.A., William L. Chapman, Biron L. Bedard, Cook & Molan, PA, Concord, NH, Kenneth G. Bouchard, Bouchard & Kleinman, PA, Hampton, NH, Lawrence Walner, Lawrence Walner & Associates Ltd., Chicago, IL, Marc Frazier Scholl, New York, NY, for Plaintiffs.

Edward A. Haffer, Sheehan Phinney Bass & Green, Manchester, NH, for Plaintiff/Defendant.

Reid H. Weingarten, Steinhart & Falconer, San Francisco, CA, William T. Hassler, Steptoe & Johnson LLP., Washington, DC, David A. Vicinanzo, Nixon Peabody LLP., Richard B. McNamara, Wiggin & Nourie, Arnold Rosenblatt, Cook, Little, Rosenblatt & Manson, Manchester, NH, Jody L. King, Stillman & Friedman, PC, Peter M. Bryce, Davis Polk & Wardwell, Gregroy A. Markel, Cadwalader Wickersham & Taft, Francis P. Barron, Cravath Swaine & Moore LLP., Michele L. Pahmer, Stroock Stroock & Lavan LLP., Jay B. Kasner, Skadden Arps Slate Meagher & Flom, LLP., New York, NY, Christian M. Hoffman, Foley Hoag LLP., Boston, MA, James E. Townsend, Londonderry, NH, for Defendants.

*PRACTICE AND PROCEDURE ORDER NO. 5*

BARBADORO, Chief J.

**\*1** The New York County District Attorney has intervened in this multidistrict litigation proceeding and seeks a stay of all discovery until he completes a parallel grand jury investigation and prosecutions of three of the defendants in this case. Several of the defendants also seek to stay discovery until I rule on their anticipated motions to dismiss. They argue that a stay is required in the Securities Actions by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 (b)(3)(B) (1997) ("stay provision"), and that prudence warrants a similar stay in the ERISA and Derivative Actions. I determine that the District Attorney's concerns can better be addressed by targeted requests for protective orders, that document discovery should proceed in the ERISA and Derivative Actions, and that documents produced in the ERISA and Derivative Actions should be shared with counsel in the Securities Actions.

I.

A. *The Civil Cases*

Plaintiffs in various jurisdictions have filed more than 30 actions against Tyco and its directors and officers. These cases were consolidated by the Judicial Panel on Multidistrict Litigation and assigned to this court for case management. The consolidated cases are grouped into one of the following three categories, depending upon the theory of liability asserted by each suit: (1) Securities Actions; (2) ERISA Actions; and (3) Derivative Actions.

The Securities Actions plaintiffs allege that the defendants violated § § 10(b) and 20(a) of the Securities Exchange Act of 1934, *see, e.g.,* 15 U.S.C. § § 78j, and Rule 10b-5 promulgated thereunder, by making material misrepresentations and failing to disclose material information regarding Tyco's accounting practices and financial condition. They further allege that certain Tyco executives violated § 20A of the Exchange Act, *see* 15 U.S.C. § 78t-1, by selling lerge amounts of Tyco common stock while in possession of material, non-public information.

The ERISA Action plaintiffs, who were employed by Tyco and participated in its retirement plan by investing in Tyco stock, allege that the defendants violated provisions of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et. seq.* (1999 & Supp.2002). Specifically, they contend that the defendants breached their fiduciary duties, mismanaged Tyco's retirement plan, made material misrepresentations and failed to disclose material

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2
2003 WL 23830479 (D.N.H.)
**(Cite as: 2003 WL 23830479 (D.N.H.))**

information regarding Tyco's accounting practices and financial condition. *See* 29 U.S.C. § 1104.

 Lastly, the Derivative Action plaintiffs contend that Tyco's directors and officers breached their fiduciary duties by, among other things, failing to properly monitor Tyco's accounting practices and oversee its financial well-being. The Derivative Action suits also include allegations that the directors and executives committed corporate waste and grossly mismanaged the corporation.

 B. *The Criminal Cases*

 The New York County District Attorney has obtained an indictment against Dennis Kozlowski, Tyco's former Chief Executive Officer, and Mark Swartz, Tyco's former Chief Financial Officer. Both men are charged with one count of Enterprise Corruption under New York Penal Law Section 460.20(1)(a), one count of Conspiracy in the Fourth Degree, under New York Penal Law Section 105.10(1), and one count of Violating New York General Business Law Section 352-C(5). The indictment also charges Kozlowski and Swartz with numerous counts of Larceny in the First Degree under New York Penal Law Section 155.42 and Falsifying Business Records in the First Degree under New York Penal Law Section 175.10. The District Attorney has also obtained an indictment against Mark Belnick, Tyco's former general counsel, charging him with six counts of Falsifying Business Records. The District Attorney further represents that he is conducting a grand jury investigation that could lead to additional charges against the three defendants and others.

 **\*2** It is undisputed that the pending charges and the grand jury investigation arise from the same events that are at issue in this proceeding.

II.

A. *The District Attorney's Request for a Stay*

 The District Attorney argues that if I allow discovery in this proceeding, it "will likely lead to the premature disclosure of sensitive information that could subvert the criminal prosecutions." Aff. of Mark Frasier Schell at ¶ 16. More particularly, he alleges that: (1) evidence of value in the criminal cases will become lost or corrupted; (2) witnesses in criminal cases will use discovery information to commit perjury; (3) witnesses in the criminal cases will be overburdened by having to respond to discovery in this proceeding; (4) my rulings might be

inconsistent with rulings made by the judge in the criminal cases; and (5) issues will arise concerning the defendants' Fifth Amendment rights. While I am sensitive to these concerns, I am not persuaded that they warrant a blanket prohibition on discovery.

 First, I am not proposing to allow the parties to take depositions or engage in other testimonial forms of discovery. Thus, there is no danger that witnesses will be discouraged from cooperating in the criminal cases because of demands placed on them in responding to deposition requests. Nor is it likely that discovery will affect the defendants' Fifth Amendment Rights. [FN1] Second, the District Attorney's unsupported assertion that evidence of value in the criminal cases will become lost or corrupted if I allow document discovery to proceed is not persuasive. If anything, document discovery will tend to preserve evidence which might otherwise be overlooked or destroyed. Third, I foresee little danger of inconsistent rulings in the state and federal cases. Other than on discovery issues, the only significant rulings that I will likely make in this case before the criminal cases are resolved will concern defendants' anticipated motions to dismiss and plaintiffs' anticipated motions for class certification. These rulings are unlikely to have any bearing on the criminal cases. Moreover, to the extent that I may be asked to rule on discovery disputes, I will pay substantial deference to any related rulings by the state court. Thus, the risk of inconsistent rulings is minimal.

> FN1. It is significant in this regard that both Kozlowski and Belnick oppose the District Attorney's request for a stay.

 I acknowledge the District Attorney's concern that witnesses in the criminal cases may exploit information obtained through discovery in this case to commit perjury. This concern, however, must be balanced against the significant interest that the parties in this proceeding have in obtaining an expeditious resolution of the pending claims. Given these competing interests, document discovery should proceed. The District Attorney should be notified of any discovery requests and given an opportunity to seek targeted protective orders pursuant to Fed.R.Civ.P. 26(c) to address any particularized concern that giving the parties access to certain documents will permit witnesses in the criminal cases to commit perjury.

 B. *Defendants' Request for a Stay*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 3
2003 WL 23830479 (D.N.H.)
**(Cite as: 2003 WL 23830479 (D.N.H.))**

**\*3** All of the defendants except Kozlowski and Belnick seek to stay discovery until I resolve their anticipated motions to dismiss. Their argument can be summarized as follows: (1) the Securities Actions assert claims that are subject to the stay provision; (2) the ERISA and Derivative Actions arise from the same course of conduct as the Securities Actions; and (3) allowing discovery in the ERISA and Derivative Actions will undermine any stay in the Securities Actions because discovery produced in the former actions inevitably will behfit the plaintiffs in the Securities Actions. While I accept defendants' contention that the PSLRA ordinarily requires a stay of discovery in securities actions, I do not agree that a similar stay is warranted in the ERISA and Derivative Actions.

Congress enacted the stay provision to deter plaintiffs from filing frivolous securities claims in the hope that either the high cost of responding to discovery will force corporate defendants to settle or that discovery will reveal information that can be used to save an otherwise deficient claim from dismissal. *See In Re WorldCom, Inc. Securities Lit., 2002 WL 31628566\*4 (S.D.N.Y.2002)* (summarizing stay provision's legislative history). While the stay provision only applies to federal securities claims, *see* 15 D.S.C. § 78u-4(b)(3)(B), its purpose clearly would be undermined if litigants could circumvent the stay by using litigation tactics. To partially address this concern, Congress amended the PSLRA to authorize a federal court to stay discovery in parallel state court actions, *see* 15 U.S.C. § 78u-4(b)(3)(D) (Supp.2002). Further, at least one circuit court has held that discovery in a case subject to the stay provision should also be stayed with respect to supplemental state law claims, *see SG Cowen Sec. v. U.S. Dist. Ct. for N.D. pf Ca., 189 F.3d 909, 913 n. 1 (9th Cir.1999).*

I would not hesitate to stay discovery in the ERISA and Derivative Actions if I were to determine that the plaintiffs filed them in an attempt to circumvent the stay provision. The evidence, however, does not support such a conclusion. The ERISA and Derivative Actions were filed as separate lawsuits by different counsel on behalf of different plaintiffs. The claims asserted in those actions are not frivolous and defendants do not claim that plaintiffs' counsel are working together to thwart the stay provision. Absent evidence of collusion, I will not stay discovery in the ERISA and Derivative Actions merely because they have been consolidated with the Securities Actions for pretrial purposes.

I am also unpersuaded by defendants' contention that a stay is warranted because the plaintiffs in the Securities Actions will derive an indirect benefit from the fact that I am allowing limited discovery in the ERISA and Derivative Actions. I recognize that if plaintiffs in the ERISA and Derivative Actions uncover new evidence of wrongdoing by the defendants, they are likely to amend their complaints and thereby provide the plaintiffs in the Securities Actions with information that may be useful in drafting their own amended complaint. I fail to see, however, how such a result will encourage plaintiffs in future cases to file frivolous securities claims. In any event, any interest that the defendants have in delaying discovery does not override the legitimate interest that the plaintiffs in the ERISA and Derivative Actions have in obtaining an expeditious resolution of their claims.

**\*4** A more difficult question is presented by plaintiffs' request in the Securities Actions for access to documents produced in the ERISA and Derivative Actions. The stay provision permits "particularized discovery" in an action subject to the stay to avoid "undue prejudice." 15 U.S.C. § 78u-4(b)(3)(B). Other courts have invoked this exception to give plaintiffs in securities cases access to information that has been made available to investigative agencies and plaintiffs in other actions. *See WorldCom, 2002 WL 31628566 at \*4-5; In Re Enron Corp. Sec. Derivative and ERISA Litig., 2002 WL 31845114 \*1-2 (S.D.Tex.2002).* These courts reason that such discovery is "particularized" because it is limited to the discovery documents that have already been produced to others and it prevents "undue prejudice" by placing all potential claimants on an equal footing with respect to discovery. *See id.* This approach makes sense in a case like this where (1) the Securities Action plaintiffs would be at a serious disadvantage if they are denied access to documents that are produced to the other plaintiffs and government investigators; (2) the defendants will not incur any additional costs if the Securities Actions plaintiffs are given access to the documents; (3) keeping all parties on an equal footing with respect to discovery serves important case management interests in this complex litigation; and (4) none of the claims at issue are frivolous.

*CONCLUSION*

For the reasons set forth in this Practice and Procedure Order, I grant plaintiffs' requests in the ERISA and Derivative Actions to engage in document discovery. Any documents produced in the ERISA and Derivative Actions shall also be made

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 4
2003 WL 23830479 (D.N.H.)
**(Cite as: 2003 WL 23830479 (D.N.H.))**

available to the plaintiffs in the Securities Actions.          SO ORDERED.
The District Attorney shall be served with copies of
any discovery requests.


    IN RE TYCO INTERNATIONAL, LTD., SECURITIES LITIGATION SERVICE LIST
                        1/29/03

Michael J. Beck                          Kenneth G. Bouchard, Esq.
Judicial Panel on MDL                    Bouchard & Kleinman
Thurgood Marshall Federal Building       369 Lafayette Rd.
Room G-255, North Lobby                  Hampton, NH 03842
One Columbus Circle, NE
Washington, DC 20002-8004                Frederick E. Upshall, Jr., Esq.
                                         Upshall, Cooper & Temple, PA
William Chapman, Esq.                    10 Green Street
Orr & Reno                               Concord, NH 03301
PO Box 3550
Concord, NH 03302-3550


Edward A. Haffer, Esq.
Sheehan, Phinney, Bass & Green, PA
1000 Elm Street
PO Box 3701
Manchester, NH 03105


William T. Hassler, Esq.
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036

Jody King, Esq.
Stillman & Friedman PC
425 Park Avenne
New York, N.Y. 10022

Richard McNamara, Esq.
Wiggin & Nourie
PO Box 808
Manchester, NH 03105


Marc Frazier Scholl, Esq.
New York County District Attorney
Office
One Hogan Place
New York, N.Y. 10013

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.